PORTLAND OIL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 81705. Promulgated October 7, 1938.

John T. Noonan, Esq., for the petitioner.
R. P. Hertzog, Esq., for the respondent.

### OPINION.

Disney: In order to dispose of the questions here presented, it is necessary first to determine whether the obligation of the Continental Oil Co. to pay $1,650,000, which was exchanged for corporate stock and securities of the petitioner, was an installment obligation under section 44 of the Revenue Act of 1928.[1]  Petitioner argues that it

[1] SEC. 44. INSTALLMENT BASIS.

(a) *Dealers in personal property.*—Under regulations prescribed by the Commissioner with the approval of the Secretary, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit realized or to be realized when payment is completed, bears to the total contract price.

(b) *Sales of realty and casual sales of personalty.*—In the case (1) of a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year), for a price exceeding $1,000, or (2) of a sale or other disposition of real property, if in either case the initial payments do not exceed 40 per centum of the selling price, the income may, under regulations prescribed by the Commissioner with the approval of the Secretary, be returned on the basis and in the manner above prescribed in this section. As used in this section the term "initial payments" means the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable period in which the sale or other disposition is made.

(c) *Change from accrual to installment basis.*—If a taxpayer entitled to the benefits of subsection (a) elects for any taxable year to report his net income on the installment basis, then in computing his income for the year of change or any subsequent year, amounts actually received during any such year on account of sales or other dispositions of property made in any prior year shall not be excluded.

(d) *Gain or loss upon disposition of installment obligations.*—If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and (1) in the case of satisfaction at other than face value or a sale or exchange—the amount realized, or (2) in case of a distribution, transmission, or disposition otherwise than by sale or exchange—the fair market value of the obligation at the time of such distribution, transmission, or disposition. The basis of the obligation shall be the excess of the face value of the obligation over an amount equal to the income which would be returnable were the obligation satisfied in full.

was not, that the sale of oil leases in 1929 by the Bu–Vi–Bar Petroleum Corporation was a transaction of sale fully taxable in that year, that the contract had a fair market value at that time of its principal amount, that full profit was recognized upon the sale in 1929, and that therefore the basis of the contract to taxpayer was the principal amount of the contract when acquired in 1929 by the Bu–Vi–Bar Petroleum Corporation.

Assuming, without deciding, that the contract with Continental Oil Co. (providing for no initial payments in 1929—and none being made in that year) would not be the basis of an installment obligation if completed in 1929, but would give petitioner a basis of the fair market value of the contract at that time, we must nevertheless decide which is the taxable year when the contract is completed, for if therein there are partial payments, the statute is obviously satisfied. The contract with the Continental Oil Co. was in consideration of payment and performance of certain "covenants and agreements to be kept and performed" by the parties, including payment of taxes, delivery of abstracts of title disclosing merchantable title free of liens and encumbrances, examination of such abstracts and correction or perfection within a reasonable time of defects found, payment of expenses of development and operation to January 1, 1930, including cost of certain tested items of equipment, and adjustment of inventory of personal property. The contract further provided for delivery of assignments to a named trustee, to be held until completion of payment and only then delivered. The stipulation recites that the assignments were delivered to the Continental Oil Co. on December 17, 1929, and Buell testified that they were so delivered. Obviously, such a delivery prior to payment would have been contrary to the contract. It seems probable that the intent of the stipulation and testimony was that delivery was to the trustee in accordance with the contract; however, it is possible that the statements are literally correct, and we will so assume and find. Such delivery of assignments of itself, however, does not show a completed transaction in 1929 between the contracting parties. The other conditions above described may or may not have been completed in that year. Moreover, Buell specifically testified that the contract was effective as of January 1, 1930, that Bu–Vi–Bar operated the property until January 1, and turned the property over as of 7 a. m., January 1, had physical control until that time, that the operation continued until then under the contract, and that they delivered possession on January 1. Considering these facts, the treatment of the obligation by Bu–Vi–Bar as an installment matter, and the burden upon petitioner to demonstrate that the transaction was completed in 1929, we are unable so to find. *Lucas* v. *North Texas Lumber Co.*, 281 U. S. 11;

and *Helen Beatrice (Duveen) Crocker et al., Executors*, 28 B. T. A. 132, 141.

Moreover, sections 113 (a) (7) and 113 (a) (8) of the Revenue Act of 1928,[2] if applicable at all, provide that the basis (of the obligation from the Continental Oil Co.) "shall be the same as it would be in the hands of the transferor * * *" (increased or decreased as hereinafter discussed). The Bu–Vi–Bar Petroleum Corporation, the original owner of the obligation, had an election as to whether to return it for tax purposes as an installment obligation. It so elected and returned the obligation on an installment basis and paid taxes accordingly. It does not appear that it ever amended such return or asked a basis different than under the installment obligation theory. The law as to installment obligation gave the Bu–Vi–Bar Petroleum Corporation a certain basis. Under the above language of section 113 (a) (7) and (8) of the statute, the basis provided by the installment obligation is the basis of the petitioner. *Wobbers, Inc.*, 26 B. T. A. 322. We therefore conclude, both upon the factual showing made and the application of the statute, that it has not been shown that the obligation of the Continental Oil Co. was taxable in the year 1929, and conclude that it was an installment obligation as reported by Bu–Vi–Bar in 1930.

Is the petitioner, then, entitled, for income tax purposes, to a "stepped-up" basis for an installment obligation acquired by it in return for its stock and bonds in a nontaxable exchange? The factual situation may be epitomized as follows: A corporation owned an installment obligation upon which it had reported and paid income tax upon installments received during one year. The two sole stockholders of the corporation furnished, one to his wife, and

---

[2] SEC. 113. BASIS FOR DETERMINING GAIN OR LOSS.

(a) *Property acquired after February 28, 1913.*—The basis for determining the gain or loss from the sale or other disposition of property acquired after February 28, 1913, shall be the cost of such property ; except that—

\* \* \* \* \* \* \*

(7) TRANSFERS TO CORPORATION WHERE CONTROL OF PROPERTY REMAINS IN SAME PERSONS.—If the property was acquired after December 31, 1917, by a corporation in connection with a reorganization, and immediately after the transfer an interest or control in such property of 80 per centum or more remained in the same persons or any of them, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made. This paragraph shall not apply if the property acquired consists of stock or securities in a corporation a party to the reorganization, unless acquired by the issuance of stock or securities of the transferee as the consideration in whole or in part for the transfer ;

(8) SAME—CORPORATION CONTROLLED BY TRANSFEROR.—If the property was acquired after December 31, 1920, by a corporation by the issuance of its stock or securities in connection with a transaction described in section 112 (b) (5) (including also, cases where part of the consideration for the transfer of such property to the corporation was property or money, in addition to such stock or securities), then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made.

the other to his wife and daughter, as gifts, money with which to purchase stock and securities in a new corporation (the petitioner). Pursuant to a plan primarily to minimize income taxes upon the receipt of the balance of the installment obligation, the first corporation exchanged the installment obligation to the new corporation for slightly less than 80 percent of its stock and securities (bonds) about three weeks after the wives and daughter had purchased, with the money furnished them, all (except qualifying shares) of the then authorized stock, which was slightly more than 20 percent of the stock and securities of the new corporation, after increase of capital stock and amount of securities. The stock and bonds acquired by the old corporation and the wives and daughter, were substantially in proportion to the property transferred (including the cash contributed by the two wives and the daughter). The old corporation was then dissolved and the stock and bonds received by it from the new corporation distributed in liquidation to the two stockholders of the old corporation. Both the old corporation and its stockholders reported no income therefrom, and none was asserted by respondent.

Although earlier contending that the stock and securities purchased by the wives and daughter with cash furnished by the husbands, the stockholders of the old corporation, were controlled by the husbands, the respondent apparently has abandoned that theory, and there seems no issue now between the parties in that regard. At any rate, in view of the conclusion reached by us, it is immaterial whether there was such control. We assume the reality and validity of the gifts to the wives and daughter.

The questions then arising are: (1) Whether the acquisition of stock and securities in the new corporation for cash by the wives and daughter, and by exchange of the installment obligation of the old corporation, constitute a single transaction so that more than 80 per cent control of the property remained in the transferors under section 113 (a) (7) of the Revenue Act of 1928 and whether under section 113 (a) (8), together with section 112 (b) (5) of the same act, the new corporation was controlled by the transferors, so that the basis of the property, the installment obligation, would be the same in the hands of the new corporation as in the hands of the old; and (2) whether in case of such control by the transferors, the fact that the property transferred was an installment obligation gives it an increased base under section 44 (d) of the Revenue Act of 1928.

That the transfers herein involved were in connection with a reorganization can hardly be doubted. Both the old corporation and its stockholders and the respondent treated the matters as constituting reorganization, with no recognition of gain or loss. The old corporation was merged in the new, its sole and only property pass-

ing to the new corporation. The "Plan of reorganization", approved and adopted by both corporations, expressly provided that Bu–Vi–Bar "merge and consolidate" with petitioner by transferring to petitioner its sole asset, the Continental Oil Co. contract. A similar situation was treated as reorganization in *Bickford's, Inc.* v. *Helvering*, 98 Fed. (2d) 568, and section 113 (a) (7) of the Revenue Act of 1928 applied. The cash with which the wives of the two stockholders and the daughter acquired stock and bonds in the new corporation constituted property within the purview of section 113 (a) (7). *Halliburton* v. *Commissioner*, 78 Fed. (2d) 265; and *Claude Neon Lights, Inc.*, 35 B. T. A. 424. Therefore, although the daughter and the two wives had acquired slightly more than 20 percent of the bonds and stock of the new corporation, property was conveyed by the transferors as a whole, including Bu–Vi–Bar Petroleum Corporation, for more than 80 percent control of the new corporation. Is the acquisition of stock and securities in the new corporation by the old corporation, the wives and daughter, to be considered a single transaction? The question as to whether the transfers constitute one transaction is one of fact. *Helvering* v. *Ward*, 79 Fed. (2d) 381; *Commissioner* v. *Harris*, 92 Fed. (2d) 374. That the avoidance of taxes was the prime object of the whole transaction, and gifts to wives and daughter and reorganization of business secondary, appears throughout the record. The attorney for Buell and Herndon told them that the gifts must be more than 20 percent. They had to give more than 20 percent. "The problem of taxation" is the first element mentioned by Buell when asked about his first consultation of counsel and the purpose thereof. Herndon, one of the husbands, testified: "Well, the plan is exactly what has been done. * * * Yes, the plan was exactly what was done." Again, he testified that the attorney presented a plan or procedure which was essentially the plan that has since been carried out, a plan that there would be a stepped-up value of the Continental Oil Co. contract, and the Portland Oil Co. would not pay tax on that money.

Moreover, to fail to see that there was a mutual understanding and agreement between the two husbands, sole stockholders of, and acting for, the old corporation, and their wives and the daughter would be to close our eyes to actualities, and to resign our function as examiners of fact. Although each party would not, in terms, state that there was agreement, such agreement nevertheless plainly appears. Buell testified that the wives and daughter were to purchase the securities (of petitioner) if they saw fit, and that "we had reason to believe they would"; that the plan as worked out by the attorney contemplated all of those things (referring specifically

to the gifts to wives and daughter, formation of petitioner, purchase of securities by wives and daughter, and turning over of the Continental Oil Co. contract to petitioner) ; asked if his wife and daughter agreed to use the money given for purchase of stock and bonds of petitioner, he "wouldn't say it was understood" but that he suggested it to them and he "naturally got the impression they were going to do it." Herndon stated that the plan included purchase of stocks and bonds by Gertrude Woods Herndon, Ethel P. Buell, and Betty Jane Buell with the proceeds of the money given them, that it was necessary that they buy "at least a certain amount of securities", that he told Gertrude Woods Herndon the attorney's plan, including her purchase of securities with the money, and she thought the plan was satisfactory and the securities were going to appeal to her; she said she intended to do it (buy the securities). Mrs. Buell, asked whether she agreed to Buell's suggestion about the money (the gift to her) being put in the Portland Oil Co., answered: "I didn't agree, but I said I would be willing." The Buell daughter, fifteen years of age, was advised by her father about the plan. He suggested that she invest in the Portland Oil Co., and she told him she thought it was a very good idea and that she would like to. She relied on her father's advice. The mutual understanding is emphasized in the fact that the check by Betty Jane Buell is dated December 3, while the money it represented was not borrowed by her father from the bank until December 6. Such "attenuated subtleties" as contentions that there was not agreement between these parties covering this whole plan do not appeal. The two sole stockholders, Buell and Herndon, represented their corporation, Bu–Vi–Bar. *Thomas* v. *United States*, 22 Fed. Supp. 412; *Pacific State Bank* v. *Coats*, 205 Fed. 618; and *Llewellyn Iron Works* v. *Abbott Kinney Co.*, 155 Pac. 986. Under these circumstances we hold that the acquisition of the stock and bonds of the new corporation by all of the transferors was one transaction, pursuant to one plan, purpose and understanding, that of acquiring a stepped-up basis for the Continental Oil Co. obligation, not separable into parts for income tax purposes. *Ahles Realty Corporation* v. *Commissioner*, 71 Fed. (2d) 150; certiorari denied, 293 U. S. 611; *West Texas Refining & Development Co.* v. *Commissioner*, 68 Fed. (2d) 77; *Tulsa Tribune Co.* v. *Commissioner*, 58 Fed. (2d) 937; *McInerney* v. *Commissioner*, 82 Fed. (2d) 665; *Edwin L. Dana*, 36 B. T. A. 231; *Hazeltine Corporation* v. *Commissioner*, 89 Fed. (2d) 513. Petitioner points out that the acquisition of stock and bonds by the women was some three weeks earlier than the acquisition of stock and bonds by Bu–Vi–Bar and its stockholders. The difference in time is, of course, in logic, to be considered, but does not control or of itself demonstrate sepa-

rateness of transactions. No showing is made of any business transacted by petitioner corporation in the interim. In *Royal Marcher*, 32 B. T. A. 76, two days elapsed; in *Von's Investment Co., Ltd.*, 33 B. T. A. 30, the time elapsed was several weeks, yet in both cases the transactions were considered as an integer; and *Von's Investment Co., Ltd., supra*, was reversed and remanded, 92 Fed. (2d) 861, in order for the Board to determine the intent and purpose of the transferors as to whether they were in furtherance of the plan of reorganization. In the instant case, as observed above, the unity of plan and agreement is obvious. Under such circumstances the lapse of time is seen as of no consequence.

Petitioner contends, however, that if we assume that the matters above described constitute a single transaction, nevertheless the "property" referred to in section 113 (a) (7) of which 80 percent interest or control must subsist in the same persons after the transfer, refers to the individual transferor and his own separate property contributed to the transfer; and that therefore, since Bu–Vi–Bar was the owner, exclusive of the women, of the Continental Oil Co. contract, before the transfer, but that after transfer neither Bu–Vi–Bar nor its stockholders had so much as 80 percent control of the new corporation and therefore of the property, then section 113 (a) (7) can not be applied. This view has been repudiated definitely in the following cases and need not be further discussed: *Durand-McNeil-Horner Co.*, 30 B. T. A. 769, 772, 773; affirmed *sub nom. Fairbanks Court Wholesale Grocery Co.* v. *Commissioner*, 84 Fed. (2d) 18; certiorari denied, 299 U. S. 582; citing *Monarch Electric & Wire Co.* v. *Commissioner*, 38 Fed. (2d) 417 (affirming 12 B. T. A. 158); *Real Estate-Land Title & Trust Co.* v. *United States*, (Not reported.) *Snead* v. *Jackson Securities & Investment Co.*, 77 Fed. (2d) 19. These cases hold that the property of the transferors, considered together, and not the property of an individual transferor, is considered in computing the 80 percent control or interest within the intendment of the statute. It therefore follows under section 113 (a) (7) of the Revenue Act of 1928 that the basis for the installment obligation is the same in the hands of the petitioner, Portland Oil Co., as in the hands of the transferors, increased in the amount of gain (or decreased in the amount of loss) recognized to the transferors upon the transfer.

The same result follows when section 113 (a) (8) of the Revenue Act of 1928 is considered, since we find that the transferors of the property acquired control of petitioner corporation substantially in proportion to their holdings of the property prior to the transfer within the language of section 112 (b) (5). Under section 113 (a) (8), of course, it is immaterial whether there is 80 percent control

of the particular property being considered by the former owners, and transferors, of that particular property. *Halliburton* v. *Commissioner, supra.*

Petitioner argues that section 112 (b) (5), and therefore section 113 (a) (8), can have no application because upon the completion of the transfer the Bu–Vi–Bar Petroleum Corporation owned no securities in taxpayer corporation. The transfer of stock and securities from the petitioner corporation was made to the Bu–Vi–Bar Petroleum Corporation and by it they were distributed to its stockholders. Immediately after the transfer, the transferors were in control of the transferee corporation. *Royal Marcher, supra.*

Petitioner next, in the alternative, contends, however, that, assuming the applicability of section 113 (a) (7) and (8), since such sections specifically give the property in the hands of the transferee a base consisting of the original base plus the amount of gain recognized to the transferor in the transfer, under section 44 (d) of the Revenue Act of 1928 gain was recognized to the full extent of the balance due under the installment contract (less the original base as adjusted by application of payments already made) and that therefore the petitioner under either section 113 (a) (7) or section 113 (a) (8) has the benefit of a basis increased by such recognized gain.

We can not assent to such a view. It misconceives the object of the whole revenue law as to nonrecognition of gain or loss in connection with reorganization matters. No such exception is indicated by the general law on the subject and petitioner is logically under a burden of demonstrating such exception. It is necessary, to agree with such view, to say that the provisions affording relief from present taxation to those reorganizing their business organizations, and deferring such taxation to the future, permit, not deferring, but the complete escape of tax, in case an installment obligation is transferred in connection with the reorganization under circumstances constituting a nontaxable exchange. Not only is it inconceivable that such could have been the intent of the statute, but examination of the report of the Senate Committee on Finance, May 1, 1928, as to section 44, covering installment sales, shows that it closes by saying:

Whether or not the gain or loss realized under the section is recognized for tax purposes, depends upon general principles of law embodied in the income tax provisions, the exchange of installment obligations in connection with tax-free exchanges, for instance, being cared for by section 112.

Section 112 being the section as to recognition of gain or loss, it is apparent that the above language can only mean that the exchange of installment obligations in connection with tax-free exchanges is subject to general law as to recognition of gain or loss—

in other words, is not to be excepted from the application of section 112 as to recognition or section 113 as to the basis for determining gain or loss. The "general principles of law embodied in the income tax provisions" can not be applied, as above suggested by the Senate Committee, without reaching that conclusion. Obviously in consonance with the above Committee report, article 355 of Regulations 74, covering installment payments, reads:

The entire amount of gain or loss resulting from the disposition or satisfaction of installment obligations shall be recognized except as provided in section 112 and articles 571–580.

Moreover, petitioner errs in contending that section 44 (d) recognizes gain upon exchange of installment obligations. That section merely states (so far as the facts herein concerned are involved) that in case of an exchange of an installment obligation "gain or loss shall result"—to the extent of the difference between the base and "the amount realized." The mere fact that gain "results" would not require recognition thereof. Section 113 (a) (7) and section 113 (a) (8) in terms add to the original basis the amount of gain "recognized." Recognition depends upon section 112—as expressly indicated by the Senate Committee as above seen. Section 112 does not recognize gain in case of transfer for stock or securities of a corporation controlled by transferor or transferors proportionately to property previously held, nor in case of exchange of property by a corporation in pursuance of a plan of reorganization solely for stock or securities in another corporation a party to reorganization. It thus appears that not only within the language of the statutes, but also within the view of the Senate Committee, there is not, in the situation here at hand, the recognition of gain which, upon the theory of the petitioner, is necessary in the language of section 113 (a) (7) and section 113 (a) (8) to give the increased base desired by petitioner. The expression "increased in the amount of gain" used in sections 113 (a) (7) and 113 (a) (8) refers to taxable gain. *Gann* v. *Commissioner*, 61 Fed. (2d) 201; certiorari denied, 287 U. S. 650, affirming 23 B. T. A. 999. We conclude that petitioner's alternative contention is not well founded, and that section 44 (d) can not be relied upon to add to the original basis of the property transferred.

We therefore hold that the basis for amounts collected in 1931 by the petitioner on the installment obligation is the original cost basis, adjusted only to that portion thereof applied against collections made in 1930. The parties having stipulated that the amount of the deficiency determined by the Commissioner is correct, if petitioner is subject to tax in 1931 on the excess of the amounts collected by it in that year under the Continental Oil Co. contract over the

778

portion of the basis not used by the Bu–Vi–Bar Petroleum Corporation on its 1930 return, we hold that such deficiency so determined by the respondent is correct. The respondent having in effect abandoned his contentions as to fraud penalty, no fraud penalty is allowed.

Reviewed by the Board.

*Decision will be entered for the respondent.*