**PORTLAND OIL CO. v. COMMISSIONER OF INTERNAL REVENUE.**

**No. 3444.**

Circuit Court of Appeals, First Circuit.

Feb. 8, 1940.

480

John T. Noonan, of Boston, Mass., for petitioner for review.

Robert N. Anderson, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, Sp. Asst. to Atty. Gen., on the brief), for Commissioner.

Before WILSON and MAGRUDER, Circuit Judges, and PETERS, District Judge.

MAGRUDER, Circuit Judge.

Portland Oil Company, a Maine corporation, petitions for review of a decision of the Board of Tax Appeals (38 B.T.A. 757) redetermining a deficiency in petitioner's income tax for the calendar year 1931 in the amount of $114,804.32. This decision by the Board affirmed the Commissioner's determination, except as to a penalty for fraud, which was disallowed, respondent having abandoned the claim for such a penalty. By stipulation, the correctness of the computation is conceded, provided there is any liability at all. Petitioner was transferee of a certain installment contract, which it claims to have acquired on a "stepped up" basis. If this contention is correct, no gain was made by petitioner in 1931 upon receipt of payment of the full balance of the contract. The Revenue Act of 1928

(45 Stat. 791) is involved, particularly Sections 44, 112 and 113, 26 U.S.C.A. §§ 44, 112, 113 note. Relevant portions of the Act are reproduced in the footnote.[1]

---

[1] "Revenue Act of 1928, c. 852, 45 Stat. 791:

"Sec. 44. *Installment Basis.*

"(a) *Dealers in personal property.*—Under regulations prescribed by the Commissioner with the approval of the Secretary, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit realized or to be realized when payment is completed, bears to the total contract price.

"(b) *Sales of realty and casual sales of personalty.*—In the case (1) of a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year), for a price exceeding $1,000, or (2) of a sale or other disposition of real property, if in either case the initial payments do not exceed 40 per centum of the selling price, the income may, under regulations prescribed by the Commissioner with the approval of the Secretary, be returned on the basis and in the manner above prescribed in this section. As used in this section the term 'initial payments' means the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable period in which the sale or other disposition is made.

*    *    *    *    *    *

"(d) *Gain or loss upon disposition of installment obligations.*—If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and (1) in the case of satisfaction at other than face value or a sale or exchange—the amount realized, or (2) in case of a distribution, transmission, or disposition otherwise than by sale or exchange—the fair market value of the obligation at the time of such distribution, transmission, or disposition. The basis of the obligation shall be the excess of the face value of the obligation over an amount equal to the income which would be returnable were the obligation satisfied in full.

"Sec. 111. *Determination Of Amount Of Gain Or Loss.*

"(a) *Computation of gain or loss.*—Except as hereinafter provided in this section, the gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the basis provided in section 113, and the loss shall be the excess of such basis over the amount realized.

*    *    *    *    *    *

"(c) *Amount realized.*—The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received.

"(d) *Recognition of gain or loss.*—In the case of a sale or exchange, the extent to which the gain or loss determined under this section shall be recognized for the purposes of this title, shall be determined under the provisions of section 112.

"(e) *Installment sales.*—Nothing in this section shall be construed to prevent (in the case of property sold under contract providing for payment in installments) the taxation of that portion of any installment payment representing gain or profit in the year in which such payment is received.

"Sec. 112. *Recognition Of Gain Or Loss.*

"(a) *General rule.*—Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 111, shall be recognized, except as hereinafter provided in this section.

"(b) *Exchanges solely in kind.*—

*    *    *    *    *    *

"(3) *Stock for stock on reorganization.*—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

"(4) *Same—Gain of corporation.*—No gain or loss shall be recognized if a corporation a party to a reorganization exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corporation a party to the reorganization.

"(5) *Transfer to corporation controlled by transferor.*—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in pro-

Bu-Vi-Bar Petroleum Corporation, hereinafter referred to as Bu-Vi-Bar, was incorporated in Delaware in 1917 and up to 1930 was actively engaged in "wild-cat" operations in the oil fields of Kansas and Oklahoma. On December 15, 1930, Buell and Herndon were the sole stockholders, president and vice-president respectively, Buell holding 8957 shares and Herndon 2982. Buell had gradually acquired a controlling interest in the corporation during the 20's and had been an officer since 1921 or 1922. Herndon had been a stockholder since about 1923.

portion to his interest in the property prior to the exchange.

\* \* \* \* \* \*

"(i) *Definition of reorganization.*—As used in this section and sections 113 and 115—

"(1) The term 'reorganization' means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation), or (B) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred, or (C) a recapitalization, or (D) a mere change in identity, form, or place of organization, however effected.

"(2) The term 'a party to a reorganization' includes a corporation resulting from a reorganization and includes both corporations in the case of an acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation.

"(j) *Definition of control.*—As used in this section the term 'control' means the ownership of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of the corporation.

"Sec. 113. *Basis For Determining Gain Or Loss.*

"(a) *Property acquired after February 28, 1913.*—The basis for determining the gain or loss from the sale or other disposition of property acquired after February 28, 1913, shall be the cost of such property; except that—

\* \* \* \* \* \*

"(6) *Tax-free exchanges generally.*—If the property was acquired upon an exchange described in section 112(b) to (e), inclusive, the basis shall be the same as in the case of the property exchanged, decreased in the amount of any money received by the taxpayer and increased in the amount of gain or decreased in the amount of loss to the taxpayer that was recognized upon such exchange under the law applicable to the year in which the exchange was made. If the property so acquired consisted in part of the type of property permitted by section 112 (b) to be received without the recognition of gain or loss, and in part of other property, the basis provided in this paragraph shall be allocated between the properties (other than money) received, and for the purpose of the allocation there shall be assigned to such other property an amount equivalent to its fair market value at the date of the exchange. This paragraph shall not apply to property acquired by a corporation by the issuance of its stock or securities as the consideration in whole or in part for the transfer of the property to it;

"(7) *Transfers to corporation where control of property remains in same persons.*—If the property was acquired after December 31, 1917, by a corporation in connection with a reorganization, and immediately after the transfer an interest or control in such property of 80 per centum or more remained in the same persons or any of them, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made. This paragraph shall not apply if the property acquired consists of stock or securities in a corporation a party to the reorganization, unless acquired by the issuance of stock or securities of the transferee as the consideration in whole or in part for the transfer;

"(8) *Same—Corporation controlled by transferor.*—If the property was acquired after December 31, 1920, by a corporation by the issuance of its stock or securities in connection with a transaction described in section 112(b)(5) (including, also, cases where part of the consideration for the transfer of such property to the corporation was property or money, in addition to such stock or securities), then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made". 26 U.S. C.A. §§ 44, 111, 112, 113 note

Bu-Vi-Bar became the owner of a one-tenth interest in certain leases and equipment of oil properties, called the Sedgwick County Block, in Kansas. With reference to this, it is stipulated as follows:

"Bu-Vi-Bar Petroleum Corporation, on December 16, 1929, entered into a contract with Continental Oil Company in which Bu-Vi-Bar Petroleum Corporation agreed to assign and transfer to Continental Oil Company its one-tenth (1/10) interest in and to certain leases of oil properties in Kansas and equipment relating thereto, the consideration for such transfer being the agreement of Continental Oil Company to pay therefor the principal sum of $1,650,000 in installments beginning on the first day of January, 1930 and continuing through October 1, 1932, together with interest at six percent (6%) per annum on the unpaid balance due on the purchase price on each monthly paying period. The contract further provided that Continental Oil Company should have the option on the first day of any month to anticipate payments and to pay any part or all of the unpaid balance of the purchase price and interest thereon to the date of payment. * * * The assignments referred to in said contract were executed and delivered to Continental Oil Company on December 17, 1929.

"During 1930 and prior to December 30, 1930, Bu-Vi-Bar Petroleum Corporation received principal monthly payments aggregating $555,000, together with interest, from Continental Oil Company under the aforesaid contract with Continental Oil Company dated December 16, 1929. The basis to Bu-Vi-Bar Petroleum Corporation, for determining the gain or loss on the sale or other disposition of the leases and property which were the subject matter of the aforesaid contract with Continental Oil Company was $153,378.11. The portion of this basis attributable under the installment method to collections by Bu-Vi-Bar Petroleum Corporation in 1930, was $51,591.77. Bu-Vi-Bar Petroleum Corporation reported the profit arising from the sale under the said contract dated December 16, 1929, of the leases and property rights to Continental Oil Company on its Federal income tax return for the calendar year 1930 on the installment basis and reported $503,408.23 on account thereof on said return as taxable income. * * * The balance of the gain which would have been taxable in the hands of Bu-Vi-Bar Petroleum Corporation if it had collected the remaining $1,-095,000 and had been taxable thereon when collected would have been $993,213.66."

Early in 1930 there was a partial reorganization involving the incorporation of Buell-Herndon and Company, and the transfer to it, in exchange for its stock, of all the assets of Bu-Vi-Bar except the Continental installment contract above mentioned, followed by the distribution of this Buell-Herndon stock to the shareholders of Bu-Vi-Bar. This transaction is not now in question.

In the fall of 1930 Buell consulted an attorney who specializes in tax matters, and invoked his services to formulate a program which would, if possible, achieve two purposes, (1) a saving of taxes on the large prospective gains to accrue to Bu-Vi-Bar from the installment contract, and (2) fulfillment of a long-cherished desire of Buell to give independent financial security to his wife and their fifteen-year-old daughter, and a desire of Herndon to make similar provision for Mrs. Herndon.

At a subsequent conference between the attorney and Messrs. Buell and Herndon, in November, 1930, the attorney outlined a "plan," which was later carried out in faithful detail under his supervision. This plan prescribed the formation of a new corporation; cash gifts to "the women;" use of this money by the women, "if they saw fit," in subscribing to the capital stock and bonds of the new corporation; declaration by Bu-Vi-Bar of a partial liquidating dividend, consisting of cash and securities, the product of payments to Bu-Vi-Bar during 1930 on account of the installment contract; transfer to the new corporation of Bu-Vi-Bar's then sole remaining asset, the installment contract, in exchange for capital stock and bonds of the new corporation; distribution of these securities by Bu-Vi-Bar to its shareholders, Buell and Herndon, who were at the same time to turn in their stock in Bu-Vi-Bar and cause that corporation to be dissolved. In conjunction with Buell and Herndon, the attorney determined the amounts which were to be given to the women. "The gifts must be more than 20% each." The attorney testified, "My thought was so that the transaction would not come under Section 113(a) (7) of the 1928 Act, which refers to 80 percent." It was explained that under existing rulings no taxable gain would accrue to Bu-Vi-Bar upon its disposition of the installment contract, though the attorney expressed some doubt as to the effect of Section 44(d);

that the new corporation would acquire the installment contract on a "stepped up" basis, which would avoid taxes to such corporation upon its receipt of the remaining installments; that the amounts received by Buell and Herndon in the partial liquidating dividend would be subject to tax; but that no taxable gain to them would accrue upon their receipt of the securities of the new corporation, in the final dissolution of Bu-Vi-Bar.

Buell and Herndon liked the plan, and went home "to see what they could do about carrying it out." Buell informed his wife and daughter of his intention to make them gifts, and explained the plan to them. "I didn't agree to that but I said that I would be willing," Mrs. Buell testified. Betty Jane testified, "I told him I thought it was a very good idea and I would like to. My father was my financial advisor and I relied on his advice." In fact, the daughter signed her stock subscription and her check therefor three days before the gift to her was actually made. Herndon made a similar explanation to Mrs. Herndon; the plan "seemed to suit her."

The willingness of the women to play their parts having been ascertained, the execution of the plan got under way. The new corporation, called the Portland Oil Company, the present petitioner, was formed on December 2, 1930, with the issue of one qualifying share to each of three nominees. On December 2 or 3, Buell arranged with the First National Bank and Trust Company of Tulsa, Oklahoma, for a thirty-day loan to himself in the amount of $276,-000 and a similar loan to Herndon in the amount of $92,000. Buell explained to the bank officials that the loans were to be applied to the making of the gifts to the women in pursuance of the aforesaid plan; that it was contemplated that the women would use the money to subscribe to securities of the Portland Oil Company, so that the money would thus probably remain in the bank during the period of the loan, to the credit of the account of the Portland Oil Company in said bank; that the receipt by Buell and Herndon of the partial liquidating dividend of Bu-Vi-Bar, as part of the plan, would put them in funds to repay the loan. The gifts to Mrs. Herndon and Miss Buell, in the amount of $92,000 each, were consummated on December 6, 1930; the gift to Mrs. Buell in the sum of $184,000 was consummated December 8. On the latter date, the Portland Oil Company issued, pursuant to subscription, 240 shares of its

capital stock (par value $100 each) to Mrs. Buell, together with its registered 60-year six per cent gold bonds, in an amount of $160,000, and to Miss Buell and Mrs. Herndon 120 shares of stock and $80,000 of bonds each. At this time, apart from the three qualifying shares held by the directors, the women held all of the authorized capital stock of petitioner.

By appropriate corporate action Bu-Vi-Bar on December 17, 1930, distributed to Buell its cash assets in the amount of $222,576.46 and securities of a value of $48,122.50 in exchange for 2988 shares of his stock in said corporation, and distributed to Herndon $89,961.20 in cash in exchange for 993 shares of his stock in said corporation. With these funds or their proceeds, Buell and Herndon early in January repaid their loans to the bank.

The final steps in the execution of the plan were completed on December 30, 1930. On that date a stockholders' meeting of the Portland Oil Company authorized an increase of its capital stock and approved the plan of reorganization. On the same day Bu-Vi-Bar assigned to petitioner its rights under the Continental installment contract; petitioner thereupon issued to and in the name of Bu-Vi-Bar 1440 shares of its capital stock and its bonds in the principal amount of $960,000. Thus Bu-Vi-Bar became the holder of 75 per cent of the outstanding and authorized capital stock of petitioner, the remaining 25 per cent being held by the women, except for the three shares of the directors. Thereafter, and on the same day, Bu-Vi-Bar assigned to Buell 1080 shares of petitioner's capital stock and 360 shares of the same to Herndon; also assigned $720,000 of petitioner's bonds to Buell and $240,000 of said bonds to Herndon. Upon surrender of the certificate for 1440 shares of petitioner's stock issued in the name of Bu-Vi-Bar, certificates for 1080 shares were issued in the name of Buell and 360 shares in the name of Herndon. Buell and Herndon surrendered to Bu-Vi-Bar their remaining shares of its stock and "this corporation was dissolved about December 30, 1930."

Taxable gains accrued to Buell and Herndon upon the partial liquidation of Bu-Vi-Bar December 17, 1930; taxes thereon were paid by the two stockholders individually. The transaction involved in the assignment of the installment contract to petitioner in exchange for 1440 shares of its capital stock and $960,000 of bonds, was treated as a non-taxable reorganization by

Bu-Vi-Bar on its federal income tax return for 1930. Similarly, Buell and Herndon in their individual returns for 1930 treated this transaction as a non-taxable reorganization and reported no taxable gain to them as a result of the final liquidation and dissolution of Bu-Vi-Bar.

During 1931 the Continental Oil Company without advance notice paid $1,095,000 principal, and interest, to petitioner, in the exercise of its option to anticipate payments and in full discharge of its obligations under the installment contract. The question on this appeal is whether a taxable gain accrued to petitioner in 1931 upon receipt of these payments. The Board of Tax Appeals found that the Continental Oil contract on December 30, 1930, had a fair market value of $1,095,000 and accrued interest; that the bonds and shares of stock issued by petitioner in exchange therefor had then a fair market value of substantially the same amount. Petitioner contends that it comes within the general rule laid down in Section 113(a) of the Revenue Act of 1928, 45 Stat. 818, that the basis of determining the gain or loss from the sale or other disposition of property "shall be the cost of such property." The Board held that both under Section 113(a) (7) and Section 113(a) (8), the petitioner in acquiring the installment contract took over the old basis as it would have been in the hands of the transferor Bu-Vi-Bar.

Petitioner advances certain preliminary arguments which, if accepted, would make it unnecessary to decide whether either Section 113(a) (7) or Section 113(a) (8) required the petitioner to take over the property on the basis to Bu-Vi-Bar.

First it is contended that the sale by Bu-Vi-Bar to Continental Oil Company of its one-tenth interest in the Sedgwick County Block of oil leases was in fact completed in 1929; that this transaction could not under the statute be an installment sale within the meaning of Section 44(b) because no "initial payments" were received in 1929, the taxable period in which the sale was made; that following the general rule that a taxpayer realizes gain upon a completed sale of property, Bu-Vi-Bar realized taxable income in 1929 measured by the difference between the tax cost to it of the leases and property sold and the fair market value at that time of the Continental contract; that the market value of the contract was its principal amount, with the result that the basis of such contract to

Bu-Vi-Bar became its principal amount, so that even if petitioner had to take over the basis to Bu-Vi-Bar there would be no tax deficiency.

We assume, without deciding, that the privilege extended to taxpayers by Section 44(b) is inapplicable where no initial payment is received in the year in which the installment sale is made, as ruled in G.C. M. 12148, C.B. xii–2, page 57.

The Board held that the petitioner had failed to sustain the burden of demonstrating that the sale was completed in 1929. We have some difficulty with this conclusion on the facts in the record, but refrain from setting forth and analyzing the evidence bearing on the point, because we do not think it would make any difference to the outcome of the case, even if the sale to Continental Oil Company were assumed to have occurred in 1929.

Bu-Vi-Bar did not report the sale on its 1929 income tax return. In its return for 1930 Bu-Vi-Bar reported as follows:

"The Sedgwick County Block of which we owned a 1/10 working interest was sold to the Continental Oil Company of Ponca City, Oklahoma, and is to be paid for by installments over a period of years as set forth in a contract between the Continental Oil Company and ourselves.

| | |
|---|---:|
| "The Contract sale price for 1/10 Sedgwick County Block | 1,650,000 00 |
| "Cost of assets sold (Details omitted) | 153,378 11 |
| "Total profit to be realized when all installments are paid | 1,496,621 89 |

"Installments received in year 1930 ($555,000.00) is 33.6363% of total sales price. Under Section No. 44 of Revenue act we are reporting for profit in 1930, 33.6363% of total profit to be realized when all installments are paid.

| | |
|---|---:|
| "Total profit to be reported in year 1930 | 503,408 23 |
| "Contingent profit yet to be realized | 993,213 66" |

This recital, coupled with the non-reporting of the sale on the return for 1929, fairly implies a representation that the sale was made in 1930, especially if, as is now contended, Bu-Vi-Bar would not have been entitled to treat this as an installment sale under Section 44(b) unless the sale had been made in 1930. In view of this representation and Bu-Vi-Bar's election, ac-

quiesced in by the Commissioner, to treat the transaction as an installment sale and thus to accept the benefit of an extension of taxes as provided in Section 44(b), Bu-Vi-Bar would be precluded from asserting, after the statute of limitations has run on a deficiency assessment for 1929, that the sale actually took place in 1929, and that the whole taxable gain under the contract accrued in that year. Crane v. Commissioner, 1 Cir., 1934, 68 F.2d 640; Commissioner v. Liberty Bank & Trust Co., 6 Cir., 1932, 59 F.2d 320, 325; Mann v. Anderson, D.C. N.Y.1937, 20 F.Supp. 643; Bothwell v. Commissioner, 10 Cir., 1935, 77 F.2d 35; Haag v. Commissioner, 7 Cir., 1932, 59 F.2d 514; Moran v. Commissioner, 1 Cir., 1933, 67 F.2d 601; Hartwell Mills v. Rose, 5 Cir., 1932, 61 F.2d 441, 444. See Pacific National Co. v. Welch, 1938, 304 U.S. 191, 194, 58 S.Ct. 857, 82 L.Ed. 1282.

█ If Section 113(a) (7) or 113(a) (8) requires the petitioner to take over the contract on the basis as it would be in the hands of the transferor, Bu-Vi-Bar, then petitioner is in no better position than Bu-Vi-Bar to assert that the sale to the Continental Oil Company took place in 1929. This conclusion involves no judicial disregard of the "corporate fiction;" nor is it strictly a case of applying an estoppel against an innocent third person who was not responsible for the representation upon which the estoppel was founded. The conclusion follows, rather, from the statutory requirement of Section 113 that in certain cases where the transferor retained control, as defined, of the corporation acquiring the property, the transferee steps into the shoes of the transferor so far as the tax basis for the property is concerned.

█ Though petitioner does not raise the point, it might be suggested that the Commissioner is not entitled to argue a defense of estoppel which he did not plead in his answer to the petition before the Board. See Helvering v. Salvage, 1936, 297 U.S. 106, 56 S.Ct. 375, 80 L.Ed. 511. But the reason he did not do this is that neither in the petition nor amended petition did petitioner allege that the sale had taken place in 1929. Rather, the allegations assume that the transaction had been correctly reported by Bu-Vi-Bar as an installment sale in 1930, for the claim is, in the alternative, either that the petitioner acquired the contract on a stepped-up basis, or if Section 113(a) (7) or 113(a) (8) is

applicable, that petitioner took over the basis to Bu-Vi-Bar increased by the amount of gain recognized to Bu-Vi-Bar upon the assignment to petitioner in 1930. If on these pleadings, petitioner is entitled to be heard on an additional claim that the assessment was in error, founded on the asserted fact that the sale took place in 1929 (an assumption we shall make in petitioner's favor), then surely the respondent must be allowed to meet this claim with a defense of estoppel or election warranted by the facts in the record. This additional claim seems to have been distinctly an afterthought.

It is next contended by petitioner that gain was recognized to Bu-Vi-Bar upon its transfer of the Continental contract to the petitioner in 1930, under the provisions of Section 44(d) dealing with the disposition of installment obligations; that even if Section 113 (a) (7) or 113(a) (8) were applicable, their express wording provides that the basis to the petitioner is the basis to Bu-Vi-Bar increased by the gain recognized to Bu-Vi-Bar upon the transfer to petitioner; that such gain would be the difference between the basis of the contract to Bu-Vi-Bar and "the amount realized" by Bu-Vi-Bar upon the sale to petitioner, that the amount thus realized was the fair market value of petitioner's securities received by Bu-Vi-Bar in exchange, which value was found by the Board to be a sum equal to the principal amount unpaid at the time on the Continental contract.

This contention is that Bu-Vi-Bar should have paid a tax in 1930 on the full amount of the gain from the Continental contract. The contention previously considered is that Bu-Vi-Bar should have paid the tax in 1929.

██ We think that Section 44(d) must be read in conjunction with Section 112, and that if by Section 112 the transaction is a tax-free exchange, it is none the less so because the property exchanged is an installment contract. That this was the intention of Congress is apparent from the following statement appearing both in the Senate and House committee reports on the subject of Section 44(d): "Whether or not the gain or loss realized under the section is recognized for tax purposes, depends upon general principles of law embodied in the income tax provisions, the exchange of installment obligations in connection with tax-free exchanges, for instance, being cared for by section 112." (H.Rep.

No. 2, 70th Cong., 1st Sess., p. 16; S.Rep. No. 960, 70th Cong., 1st Sess., p. 24.)

■ A similar statement appears in Treasury Regulations 74, article 355. Since the language of the statute is reasonably susceptible of the interpretation thus put upon it by the Committees of Congress and by the Treasury Regulations, this interpretation will be accepted by the courts.

In view of the foregoing, consideration must be given to Sections 112 and 113.

The Board concluded: "That the avoidance of taxes was the prime object of the whole transaction, and gifts to wives and daughter and reorganization of business secondary, appears throughout the record." Petitioner offered testimony to the effect that there was a business reason other than taxes for the organization of a new corporation. Bu-Vi-Bar had been in the speculative end of the oil business. Buell wanted to turn to the more conservative business of buying royalties and producing properties, and not knowing what obligations Bu-Vi-Bar might have incurred at a time before he acquired control, he wanted to "have something new, with a clean bill of health." The Board apparently was not impressed with this explanation, and rightly so, first because of Buell's testimony at another point that Bu-Vi-Bar "did not have any liabilities, whatsoever" on December 30, 1930, and second, because if it had, the distribution of all its assets would have been a fraudulent conveyance. The Board, as clearly warranted from the record, assumed "the reality and validity of the gifts to the wives and daughter." But it is manifest from the facts previously stated that the making of the gifts was woven into the plan as worked out by the attorney for the purpose of enabling the new corporation to receive the balance of installments under the Continental contract without paying a tax thereon. Otherwise, Buell and Herndon, instead of going to the trouble and expense of borrowing $368,000 from the bank to make the gifts, would have presented the women with shares of stock in Bu-Vi-Bar or, after the reorganization, with shares of stock in the Portland Oil Company. In substance, no fresh capital was brought into the reorganized business; by a round-about way the partial liquidating dividends distributed to Buell and Herndon on December 17, 1930, were used by them to make the gifts which the women put back into the business.

But how far should the existence of this tax motive affect the application of Sections 112 and 113? The Government argues that "if the petitioner is not subject to the deficiency here in question this clear profit of $993,213.66 will go untaxed." This is not necessarily so. Assuming the various exchanges made in pursuance of the plan were non-taxable transfers under the reorganization provisions of Section 112, there has been merely a postponement of the recognition of a gain, and Buell and Herndon hold their Portland Oil Company securities on the old basis of the property they surrendered in exchange, that is, their shares of stock in Bu-Vi-Bar. Section 113(a) (6). What that basis is, does not appear in the record; it may well be that large taxable gains will accrue to Buell and Herndon whenever they may dispose of their Portland Oil Company securities. This is subject to many contingencies, but Congress in enacting Section 112 must have understood the risk that postponement of a recognition of gain might result in the ultimate collection of a lesser tax or none at all. On the other hand, in certain contingencies, it might result in the ultimate collection of greater taxes. As for petitioner, considered as a separate legal entity, if it is required by Section 113 to take the Continental contract on the old basis to Bu-Vi-Bar, its "gain" on receipt of the balance of installments is merely a technical gain for tax purposes. It made no real profit which could be used to pay dividends, because the actual cost to it of acquiring the contract was an amount equal to the unpaid installments.

■ The shoe is often on the other foot. Thus Section 112(b) (5) and Section 113 (a) (8) are complementary; if a gain or loss is not recognized in a transfer under Section 112(b) (5), the basis of the property to the transferee, by force of Section 113(a) (8), becomes the same as it would be in the hands of the transferor. If the Government is seeking to collect a tax on a gain realized by the transferee upon its subsequent disposition of the property, the Government may be urging an interpretation that would bring the original transfer within the non-recognition provisions of Section 112(b) (5), in order to charge the transferee with the transferor's basis; whereas the taxpayer in such a case will be trying to show that the original transfer was taxable. But if the Government is seeking to collect a tax from the transferor

upon a gain realized upon the transfer, the contentions of the parties as to the interpretation of Section 112(b) (5) may be reversed. Similarly, fidelity of the Government and the taxpayer to a consistent interpretation may be difficult when in one case the Government is seeking to establish a gain and in another case the taxpayer is seeking to establish a loss. The non-recognition provisions of Section 112 apply to both.

Hence, it would seem, the fact that a calculation of tax alternatives played a part in dictating the form in which the transaction was cast should not color our thinking in construing these difficult sections of the Revenue Act. Rather, the effort should be to seek out the true intendment of the law, let the chips fall how they may in the particular litigation. Otherwise, to change the metaphor, interpretative chickens may come home to roost at a time when the barnyard wears quite a different aspect.

If either Section 113(a) (7) or Section 113(a) (8) applies to petitioner, the deficiency was properly assessed. We do not stop to resolve our doubts as to Section 113(a) (7), because we are satisfied that the facts fall within Section 113(a) (8), in conjunction with Section 112(b) (5). These latter sections, though they overlap somewhat with Section 113(a) (7), also apply to situations where there may be no technical corporate reorganization.

It is the purpose of Section 112(b) (5) to save the taxpayer from an immediate recognition of a gain, or to intermit the claim of a loss, in certain transactions where gain or loss may have accrued in a constitutional sense, but where in a popular and economic sense there has been a mere change in the form of ownership and the taxpayer has not really "cashed in" on the theoretical gain, or closed out a losing venture. As was said in American Compress & Warehouse Co. v. Bender, 5 Cir., 1934, 70 F.2d 655, 657, "The transaction described in the statute lacks a distinguishing characteristic of a sale, in that, instead of the transaction having the effect of terminating or extinguishing the beneficial interests of the transferors in the transferred property, after the consummation of the transaction the transferors continue to be beneficially interested in the transferred property and have dominion over it by virtue of their control of the new corporate owner of it."

Under Section 112(b) (5) of the 1928 Act, as well as under the corresponding provisions of earlier acts, it is well settled that co-ownership of the property to be transferred is not necessary, and that gain or loss will not be recognized where two or more persons by pre-arrangement transfer to the acquiring corporation separately-owned properties, provided the transferors in the aggregate have an 80 per cent "control" as defined in Section 112(j), 26 U.S.C.A. § 112(h), and provided further that the several transferors receive stock of the acquiring corporation in substantially the same proportions as the fair market values of their respective contributions. American Compress & Warehouse Co. v. Bender, supra; Snead v. Jackson Securities & Investment Co., 5 Cir., 1935, 77 F.2d 19; Halliburton v. Commissioner, 9 Cir., 1935, 78 F.2d 265; Von's Investment Co., Ltd., v. Commissioner, 9 Cir., 1937, 92 F.2d 861. See Bassick v. Commissioner, 2 Cir., 1936, 85 F.2d 8. See also Miller, Hendricks and Everett, Reorganizations and Other Exchanges in Income Taxation, Section 63.

It is also clear that the several transfers need not be effected simultaneously, where executed in pursuance of an antecedent arrangement. Von's Investment Co., Ltd., v. Commissioner, supra; Halliburton v. Commissioner, supra; see West Texas Refining & Development Co. v. Commissioner, 10 Cir., 68 F.2d 77.

We see no reason to disagree with the decisions in Halliburton v. Commissioner, supra, and in Claude Neon Lights, Inc., v. Commissioner, 1937, 35 B.T.A. 424, that "property" in Section 112(b) (5) includes money; so that if by prearrangement one person puts money into the acquiring corporation, in exchange for stock, and another person puts in property of a different sort, in exchange for stock, the applicability of Section 112(b) (5) will depend upon whether the two transferors, in the aggregate, and in the proper proportions, have control of the acquiring corporation as defined in Section 112(j). Where it is necessary to differentiate between money and other property, the statute does so. See Section 112(c) (d) and (e), 45 Stat. 817; also Section 113(a) (8). Section 111(c) speaks of "the fair market value of the property (other than money) received," and a similar form of expression is found in Section 113(a) (6). It seems that when Congress did not intend the word "property" to have

its broad common meaning, it introduced an appropriate qualification. Thus in Section 204(a) (8) of the 1926 Act, 44 Stat. 15, the section corresponding to Section 113(a) (8) of the 1928 Act, the paragraph started, "If the property (other than stock or securities in a corporation a party to a reorganization)" etc. This qualifying parenthesis was omitted in the 1928 Act.

The transferor who conveys to a corporation property other than money in exchange for stock, is quite as much entitled to insist upon a non-recognition of gain, or disentitled to claim a loss, within the spirit and purpose of Section 112(b) (5), in the case where the other transferor by prearrangement puts in money in exchange for stock, as in the case where the other transferor puts in something other than money.

The petitioner challenges the finding of the Board that: "The acquisition of stock and securities in petitioner corporation by Bu-Vi-Bar, Ethel P. Buell, Gertrude Woods Herndon, and Betty Jane Buell in exchange for their property was as to each substantially in proportion to the interest of each in the property held by them prior to the exchange, and the acquisition of stock and securities by Bu-Vi-Bar and the women constituted only one transaction." It is objected that the record discloses no legally binding agreement between the women on the one hand and Bu-Vi-Bar and its shareholders on the other, to join in the transfers to the new corporation. As to this, the Board observed, justly we think: "to fail to see that there was a mutual understanding and agreement between the two husbands, sole stockholders of, and acting for, the old corporation, and their wives and the daughter would be to close our eyes to actualities, and to resign our function as examiners of fact. Although each party would not, in terms, state that there was agreement, such agreement nevertheless plainly appears." Moreover, as was said in Helvering v. Elkhorn Coal Co., 4 Cir., 95 F. F.2d 732, at page 738: "Even though there was no unifying contract, the unity of the plan brings the case within the rule applied in Starr v. Commissioner, 4 Cir., 82 F.2d 964." In Royal Marcher v. Commissioner, 1935, 32 B.T.A. 76, 80, separate transfers by an individual and by a corporation to an acquiring corporation in exchange for all its stock, as part of one general plan, were held within Sections 112(b) (5) and 113(a) (8), though it did not appear that there was any contract between the transferors; the general plan apparently having

been an informal family understanding between husband and wife. See also Von's Investment Co., Ltd., v. Commissioner, 9 Cir., 92 F.2d 861, where an individual transferred securities to the A Corporation on May 31 in exchange for stock in said corporation, and the X Corporation transferred similar securities to the A Corporation on July 5, and the court said these transfers could be treated as a single transaction under Section 112(b) (5) if made in pursuance of a pre-existing agreement between the parties beneficially interested, although at the time of the first transfer on May 31 the X Corporation had not made any contract—indeed, had not yet been created.

Finally, petitioner urges that if the "single transaction" doctrine is to be invoked to link together the successive transfers by the women and by Bu-Vi-Bar, then in fairness we should take the plan in its entirety, including its final step, the liquidation and dissolution of Bu-Vi-Bar. Immediately after the completion of this final step, the transferors collectively, Bu-Vi-Bar and the women, were not in control of petitioner; such control then lay in Buell, Herndon, and the women. Hence it is argued that the single transaction, if such it is, does not fall within Sections 112(b) (5) and 113(a) (8).

But the answer is that we are not now concerned with the corporate reorganization provisions of the Act, where in certain cases the crucial point may be the situation after the completion of the final step in the so-called plan of reorganization. See Helvering v. Bashford, 1938, 302 U.S. 454, 458, 58 S.Ct. 307, 82 L.Ed. 367; Gregory v. Helvering, 1935, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, 97 A.L.R. 1355; Thurber v. Commissioner, 1 Cir., 1936, 84 F.2d 815. Section 112(b) (5) may be applicable in the absence of a corporate reorganization, and so far as this section is concerned the relevant portions of the plan outlined by the attorney are the transfers to the newly organized corporation by the women and by Bu-Vi-Bar. Immediately after the completion of the second of these prearranged transfers, the transferors, Bu-Vi-Bar and the women, were in control of petitioner, the acquiring corporation, through their ownership, in proportion to their respective contributions, of practically all the capital stock of petitioner. Section 112(b) (5) does not say that such control shall "remain" in the transferors. "It is not material that at a time subsequent to the consummation of the exchange of property solely for

corporate stock the transferor corporations ceased to be in control of the transferee corporation." American Compress & Warehouse Co. v. Bender, 5 Cir. 1934, 70 F.2d 655, 657; Schmieg, Hungate & Kotzian, Inc., v. Commissioner, 1932, 27 B.T. A. 337. If, immediately after the completion of the exchange, the transferors are in control of the acquiring corporation, the statutory reason for non-recognition of gain or loss *in that exchange* is fully satisfied, for there has been a mere change in the form of ownership without relinquishment of control.

The character of this transaction is not altered by what the transferor may subsequently do with the property received in exchange; such a subsequent transfer should stand on its own footing and may or may not involve the recognition of a gain or loss, depending upon what kind of a transfer it is. A simple illustration will make this clear: Suppose A owns a business worth $100,000. Its basis to A is $50,000. A desires to draw out part of his interest and to associate others in the business with him. A makes a contract with B, contemplating the organization of a corporation, the transfer to it of all the assets of the business in exchange for all its capital stock, and a sale by A to B of one-half the capital stock so received, for $50,000. When A transfers the assets to the corporation in exchange for its capital stock he has not really "cashed in" on a gain of $50,000 and, properly enough, under Section 112(b) (5) no gain will be recognized at that point. But under Section 113(a) (6) A will hold the corporate stock on the old basis of the assets he transferred to the corporation, that is, on a basis of $50,000. When, after this exchange, and pursuant to the contract, he sells to B one-half of the stock for $50,000, he then realizes a taxable gain of $25,000. So far as Section 112(b) (5) is concerned, the result is the same as if A had first sold to B a one-half interest in the assets for $50,000, and then A and B had jointly transferred all the assets to the corporation in exchange for its capital stock.

If the question could be considered doubtful where at the time the transferor receives the stock he is already under a contract obligation to convey it to a third person (we think this should make no difference, but see Hazeltine Corporation v. Commissioner, 3 Cir., 1937, 89 F.2d 513, with which compare Schmieg, Hungate & Kotzian, Inc., v. Commissioner, supra), no

such situation is presented here. Upon receipt of petitioner's stock on December 30, 1930, Bu-Vi-Bar was under no obligation to sell it to third persons. Furthermore, under the particular facts of this case, Buell and Herndon, Bu-Vi-Bar's sole stockholders, without wrong to anyone, could have then elected to maintain the corporate existence of Bu-Vi-Bar, either as a holding company or as an operating company in the "wild-cat" end of the oil business, leaving the more conservative operations to petitioner "with a clean bill of health." Had they so chosen, Section 112 (b) (5) would clearly have applied to Bu-Vi-Bar's previous transfer of the installment contract to petitioner. The fact that they chose to cause the dissolution of Bu-Vi-Bar in no way affected the integrity of that previous transfer, nor did it make any less applicable the underlying reason why that transfer should not involve the recognition of gain or loss.

Therefore, since under Section 112(b) (5) no gain was recognized to Bu-Vi-Bar upon its assignment of the installment contract to petitioner on December 30, 1930, Section 113(a) (8) commands that the basis of the contract to petitioner "shall be the same as it would be in the hands of" Bu-Vi-Bar. The deficiency assessment was lawfully made.

The decision of the Board of Tax Appeals is affirmed.