CANNONSBURG SKIING CORPORATION, (FORMERLY BROWN-SCHAEFER CORPORATION), TRANSFEREE OF THE ASSETS OF CANNONSBURG SKIING CORPORATION, TRANSFEROR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; WALTER J. RUSSELL and MARY ANN RUSSELL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cannonsburg Skiing Corp. v. Commissioner
Docket Nos. 5210-83, 5211-83[1]
.
United States Tax Court
T.C. Memo 1986-150; 1986 Tax Ct. Memo LEXIS 456; 51 T.C.M. (CCH) 844; T.C.M. (RIA) 86150; April 16, 1986. *456 Brown-Schaefer acquired 98 percent of Old Cannonsburg by purchase and 2 percent in a stock-for-stock exchange. Old Cannonsburg subsequently merged into Brown-Schaefer, which changed its name to New Cannonsburg. The merger qualified as a section 332 liquidation to which section 334(b)(2) applied. Held: Old Cannonsburg's merger into Brown-Schaefer did not constitute a section 368(a)(1)(F) reorganzation. Held further, New Cannonsburg cannot carry back post-merger net operating losses to offset Old Cannonsburg's pre-merger net operating income. Held further,Brown-Schaefer takes a cost basis in the Old Cannonsburg stock acquired pursuant to a stock-for-stock exchange. Held further, Russell's exchange of Old Cannonsburg stock for Brown-Schaefer stock is a taxable exchange and not a tax-free reorganization. Held further, Russell's exchange of Old Cannonsburg stock for Brown-Schaefer stock does not qualify as a section 351 contribution to capital. Walter J. Russell, for the petitioners. Oksana O. Xenos, for the respondent. WHITAKER
MEMORANDUM OPINION WHITAKER, Judge: Respondent determined Cannonsburg Skiing Corporation (New Cannonsburg) to be liable, as transferee, [2] for deficiencies *457 in Federal income tax of Connonsburg Skiing Corporation (Old Cannonsburg), as transferor, for the years and in the amounts indicated: [3] Year [4] Deficiency 1977
$34,670.45
1978
52,656.19
[5] 1978 61,499.41 Respondent determined a deficiency in Walter J. Russell's (Russell) and Mary Ann Russell's 1978 Federal income tax in the amount of $7,239.60. After concessions, the issues presented for consideration are: (1) Whether the merger of Old *458 Cannonsburg (the acquired corporation) into New Cannonsburg (the acquiring corporation) constitutes a section 368(a)(1)(F) [6] reorganization (F reorganization); (2) whether New Cannonsburg is entitled to carry back post-merger net operating losses to offset Old Cannonsburg's pre-merger net operating income; (3) whether Brown-Schaefer Corporation (Brown-Schaefer) takes a cost basis or a carry over basis in Old Cannonsburg stock received pursuant to a stock-for-stock exchange; (4) whether Russell's exchange of Old Cannonsburg stock for Brown-Schaefer stock constitutes a reorganization for purposes of section 354(a)(1); and (5) whether Russell's exchange of Old Cannonsburg stock for Brown-Schaefer stock qualifies as a contribution to capital pursuant to section 351. All of the facts have been stipulated pursuant to Rule 122, and are found accordingly. The Stipulation of Facts and attached exhibits are incorporated herein by this reference. [7] *459 Old Cannonsburg was a corporation organized under the laws of the State of Michigan on June 28, 1965. Old Cannonsburg's principal place of business was Belmont, Michigan, where it operated a ski resort. Russell and Mary Ann Russell, husband and wife, resided in Grand Rapids, Michigan, at the time their petition herein was filed. Russell was a shareholder of Old Cannonsburg from 1967 until October 24, 1978, on which date he surrendered his 1,857 shares of Old Cannonsburg stock for 3,233.2 shares of Brown-Schaefer stock. From its incorporation until May 5, 1978, Old Cannonsburg's authorized stock consisted of 215,000 voting common shares, of which 118,157 were outstanding and owned as follows: Percent
Shareholder
Number of Shares
Interest
C. William Goff
103,800
87.85
John D. Bunbury
3,750
3.17
John Schermerhorn
3,750
3.17
Old Kent Bank as Trustee
for Rosemary E. Thomas
5,000
4.24
Walter J. Russell
1,857
1.57
Total
118,157
100.00 On October 21, 1977, Paul W. Brown, Prentiss M. Brown, Jr., and Roy A. Schaefer (Brown Group) agreed to purchase 116,300 shares (approximately 98 percent) of outstanding *460 Old Cannonsburg stock from C. William Goff, John D. Bunbury, John Schermerhorn, and Old Kent Bank as Trustee for Rosemary E. Thomas (Goff Group). Of the original shareholders, only Russell was not a party to the Stock Purchase Agreement (Agreement). The Agreement provided for a purchase price of $21.1583 per share (for a total of $2,460,710.26). A down payment equal to 20 percent of the purchase price was to be paid at closing. Additionally, $10,000 in earnest money was to be paid at the time the Agreement was signed. Such earnest money would be deducted from the 20-percent down payment, and promissory notes providing for annual payments on principal and interest were to be executed at the time of closing. The Agreement contemplated that the right to purchase would be assigned to a corporation wholly owned by the Brown Group. Consummation of the stock purchase was contingent upon the Michigan Liquor Control Commission's approval of the transfer of Old Cannonsburg's liquor license and official permits to the buyers. The closing date was to be no later than 30 days subsequent to the Commission's approval. Due to the parties' inability to promptly obtain such approval, the Agreement *461 was amended on January 31, 1978, as follows: (1) interest on the unpaid portion of the down payment was to accrue commencing October 1, 1977, and (2) interest on the principal balance was to accrue commencing December 1, 1977. Interest on the down payment was to be paid at closing and interest on the principal was to be paid as part of the first annual installment. On February 6, 1978, Brown-Schaefer was organized under the laws of the State of Michigan. The Brown Group held equal one-third interests in stock subscription agreements for Brown-Schaefer's authorized capital stock. These same individuals comprised Brown-Schaefer's board of directors. Pursuant to the October 21, 1977, Agreement, they assigned their rights and interests under the Agreement to their newly formed and wholly owned corporation. Brown-Schaefer had no independent trade or business and the only assets it had prior to the purchase were funds provided by the Brown Group to be used as a down payment on the Old Cannonsburg stock. On March 1, 1978, Brown-Schaefer commenced active management of Old Cannonsburg. On May 5, 1978, Brown-Schaefer purchased approximately 98 percent of Old Cannonsburg's outstanding shares *462 and the Brown Group became the sole members of Old Cannonsburg's board of directors. After the closing and until October 31, 1978, Old Cannonsburg was operated as a subsidiary of Brown-Schaefer. The remaining 2 percent of Old Cannonsburg was owned by Russell. At the time Brown-Schaefer purchased its majority interest, Russell was secretary and attorney for Old Cannonsburg as well as a member of the board of directors.Russell had not, however, been actively involved in the management of Old Cannonsburg other than in his professional capacity as attorney adviser. In the negotiations leading up to the October 21, 1977, Agreement, the Brown Group attempted to purchase Russell's 2-percent interest in Old Cannonsburg. Brown-Schaefer renewed the offer to purchase Russell's interest at the time the 98-percent stock purchase was consummated. Russell declined the offer on both occasions because he desired to retain an equity interest in Old Cannonsburg as an investment. On October 23, 1978, a special meeting of the board of directors of Old Cannonsburg was held wherein a plan of reorganization was unanimously adopted. Integral to the plan of reorganization was the acquisition by Brown-Schaefer *463 of Russell's 2-percent interest in Old Cannonsburg. To this end, a letter dated October 23, 1978, was hand delivered to Russell. The letter purported to constitute a plan of reorganization, and contained an offer to exchange Brown-Schaefer stock for Russell's Old Cannonsburg stock. In pertinet part, the letter reads as follows: This letter will constitute a Plan of Reorganization as required by IRS Regulation 1.368-3 and is to advise you that the Board of Directors of Brown-Schaefer Corporation has deemed it expedient to acquire all of the outstanding shares of Cannonsburg Skiing Corporation not previously acquired by Brown-Schaefer pursuant to the Stock Purchase Agreement of October 21, 1977. You are the only shareholder of Cannonsburg Skiing Corporation other than Brown-Schaefer and at the time of our purchase of the balance of the outstanding shares you declined to sell your shares because you wished to continue to have an interest in the business of Cannonsburg. Brown-Schaefer believes that it is in its best interest that Cannonsburg Skiing Corporation become a wholly owned subsidiary. However, realizing that you have no desire to terminate your interest in ownership of the *464 business operated by Cannonsburg Skiing Corporation, we hereby offer to trade you shares of Brown-Schaefer Corporation for your Cannonsburg Skiing Corporation common stock. * * * Failure to accept the offer will, of course, leave Brown-Schaefer Corporation free to accomplish its purpose through other means. On October 24, 1978, Russell accepted Brown-Schaefer's offer and surrendered his 1,857 shares of Old Cannonsburg stok for 3,233.2 shares (approximately 7 percent) of Brown-Schaefer's outstanding common stock. [8] Thus, on October 24, 1978, Old Cannonsburg became a wholly owned subsidiary of Brown-Schaefer. On the same day, a special meeting of the board of directors of Brown-Schaefer was held wherein a Plan of Merger of Old Cannonsburg into Brown-Schaefer was adopted. The relevant minutes of this meeting read as follows: The President, Paul *465 W. Brown, stated that the Corporation has acquired one hundred percent (100%) of the outstanding capital stock of Cannonsburg Skiing Corporation and that the purchase of such stock was for the purpose of acquiring the assets of Cannonsburg Skiing Corporation, making such a wholly-owned subsidiary. Mr. Brown further stated that no purpose would be served by the continuation of the operation of Cannonsburg Skiing Corporation as a wholly-owned subsidiary of Brown-Schaefer Corporation and that counsel for the Corporation recommended that Cannonsburg Skiing Corporation be merged into Brown-Schaefer Corporation. Pursuant to resolutions adopted by the board of directors of Old Cannonsburg and Brown-Schaefer, Old Cannonsburg was merged into Brown-Schaefer effective October 31, 1978. All shares of the authorized capital stock of Old Cannonsburg ceased to exist on the effective date of the merger and the name of the resulting corporation was changed to Cannonsburg Skiing Corporation (New Cannonsburg). New Cannonsburg was a corporation organized and existing under the laws of the State of Michigan and continued to operate the same business at the same location as had heretofore been operated *466 by Old Cannonsburg. Old Cannonsburg had operated a ski resort on approximately 291 acres of land, which included a main lodge with ski shop, lounge, bar, dining rooms, and maintenance facilities. Related land improvements included lifts and tows, snow-making and grooming equipment, slope lighting, and landscaping. By virtue of Brown-Schaefer's purchase of 98 percent of Old Cannonsburg's stock, the merger of Old Cannonsburg into Brown-Schaefer constituted a complete liquidation pursuant to section 332, to which section 334(b)(2) applied. Thus, New Cannonsburg was entitled to a cost basis in Old Cannonsburg's assets. Old Cannonsburg's adjusted basis and New Cannonsburg's cost basis in the transferred real and tangible personal property (fixed assets) are set forth below: Old Cannonsburg's
New Cannonsburg's
Description
Adjusted Basis
Cost Basis
Land
$ 260,614
$ 705,853
Landscaping
2,395
12,096
Sewage System
69,944
161,877
Buildings
493,271
1,548,322
Lifts & Tows
136,998
363,955
Slope Equipment
22,925
113,136
Rental Equipment
65,505
60,481
Snow Making
33,402
121,319
Grooming
42,165
143,376
Slope Lighting
44,609
109,222
Ski Slope Equip.
13,250
24,193
Furniture-Lodge
51,493
106,732
Furniture-Cafe
58,579
87,164
TOTAL
$1,295,150
$3,557,726
*467 Subsequent to the merger, New Cannonsburg incurred net operating losses which it attempted to carry back to offset Old Cannonsburg's net operating income foir the years at issue. OPINION The parties agree that the merger of Old Cannonsburg into New Cannonsburg constitutes a complete liquidation of a subsidiary into its parent pursuant to section 332 and that New Cannonsburg take a cost basis in Old Cannonsburg assets pursuant to section 334(b)(2). The first issue for consideration is whether New Cannonsburg is entitled to carry back post-merger net operating losses to offset Old Cannonsburg's pre-merger net operating income. Section 381 governs the carry over of tax attributes in connection with certain corporate reorganizations and acquisitions. The "operating rules" set forth in section 381(b) impose certain limitations upon the extent to which a successor corporation steps into the "tax shoes" of its predecessor. Section 381(b)(3) provides that the transferee corporation shall not be entitled to carry back a net operating loss for a taxable year ending after the date of transfer to a taxable year of the transferor corporation ending before the date of transfer unless that transfer *468 qualifies as an F reorganization. [9] Thus, the carry back of post-merger losses is contingent upon a finding that the merger of Old Cannonsburg into New Cannonsburg constitutes an F reorganization. An F reorganization is defined as "a mere change in identity, form, or place of organization, however effected." This language strongly suggests that F reorganizations were meant to be limited to only minor corporate adjustments. Berger Machine Products, Inc. v. Commissioner,68 T.C. 358 (1977). For the years at isssue (1977 and 1978), however, the merger of a wholly owned subsidiary into its parent which qualifies as a liquidation under section 332 to which section 334(b)(2) does not apply can qualify as an F reorganization *469 for purposes of section 381(b)(3).[10]Performance Systems, Inc. v. United States,382 F.Supp. 525 (M.D. Tenn. 1973), affd. per curiam 501 F.2d 1338 (6th Cir. 1974); Eastern Color Printing Co. v. Commissioner,63 T.C. 27 (1974). One underlying premise of all reorganizations is that there be significant continuing proprietary interest. The controversy in this case focuses upon the requirement of an identity of shareholders and their respective proprietary interests. This "continuity of interest" doctrine developed as a judicial embellishment of the reorganization provisions and is now codified in the applicable regulations, which provide that "[t]he term [reorganization] does not embrace the mere purchase by one corporation of the properties of another corporation for it imports a continuity of interest on the part of the transferor or its shareholders is the properties transferred." Section 1.368-2(a), Income Tax Regs. Thus, in order for a corporate combination to warrant tax-free reorganization treatment, the former owners of the acquired corporation must maintain a continuing proprietary interest in the acquiring corporation. See Cortland Specialty Co. v. Commissioner,60 F.2d 937, 940 (2d Cir. 1932), *470 affg. 22 B.T.A. 808 (1931), cert. denied 288 U.S. 599 (1933). This Court, and the Sixth Circuit to which this case would be appealed, have emphasized the importance of continuity of shareholder interest in the context of F reorganizations, holding that a complete identity of shareholders and their proprietary interests is a prerequisite for F reorganizations. Performance Systems, Inc. v. United States,supra;Romy Hammes, Inc. v. Commissioner,68 T.C. 900 (1977); Berger Machine Products, Inc. v. Commissioner,supra; but see Aetna Casualty & Surety Co. v. United States,568 F.2d 811 (2d Cir. 1976). Any test of the identity of shareholders and their proprietary interests must incorporate tht step-transaction doctrine, wherein a series of formally separate steps are considered together as component parts of an overall plan. In Brown v. United States,782 F.2d 559 (6th Cir. 1986), *471 remanding 600 F. Supp. 47 (W.D. Ky. 1984), the Sixth Circuit adopted the "end result" test, which we will follow in this case. Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). Under the "end result" test: purportedly separate transactions will be amalgamated into a single transaction when it appears that they were really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result. * * * [Brown v. United States,supra, at 564, quoting King Enterprises, Inc. v. United States,418 F.2d 511 at 516 (Ct. Cl. 1969), quoting Herwitz, Business Planning, 804 (1966).] Thus, the Sixth Circuit clearly makes intent a necessary element for application of thr step-transaction doctrine. A valid F reorganization therefore requires an identity of shareholders and their respective proprietary interests after related transactions have been integrated and treated as a whole. With these requirements in mind, we turn to the facts of the transaction before us. The Brown Group's acquisition of Old Cannonsburg's business and assets involved the following three steps: (1) The negotiations for 100 percent of Old *472 Cannonsburg's stock, the agreement for purchase of 98 percent of the stock, and consummation of that agreement; (2) the exchange of Russell's Old Cannonsburg stock for Brown-Schaefer stock; and (3) the merger of Old Cannonsburg into Brown-Schaefer. On these facts, the continuity of interest issue is basically one of timing and intent: at what stage in these transactions should the shareholders' proprietary interests be measured? New Cannonsburg contends that step one should be treated as being separate and distinct from steps two and three. By separating Brown-Schaefer's purchase from the subsequent exchange and merger, New Cannonsburg maintains that there was an identity of shareholders immediately before and after the merger, and that only a modest shift in proprietary interests occurred. In support of this argument, New Cannonsburg emphasizes the binding nature of the stock purchase agreement signed on October 21, 1977, and the passage of more than a year between the signing of the agreement and the merger of the corporations on October 31, 1978. It concludes that Brown-Schaefer's purchase of Old Cannonsburg stock should be viewed separately and not simply as a means of acquiring *473 Old Cannonsburg's business and assets. [11] Respondent takes the position that New Cannonsburg is not entitled to carry back its net operating loss because the merger of Old Cannonsburg into New Cannonsburg did not qualify as a reorganization within the meaning of section 368(a)(1)(F). He contends that, for the merger to qualify as such a reorganization, the continuity-of-interest requirement must be satisfied, that in applying such requirement, *474 the step-transaction doctrine must be considered, that we must apply the continuity-of-interest requirement by looking to whether there was a continuity of interest of the historic shareholders of Old Cannonsburg and that when so applied, the continuity-of-interest requirement was not satisfied. Thus, respondent contends that steps one, two, and three should be collapsed under the step-transaction doctrine and treated as an acquisition by New Cannonsburg of Old Cannonsburg's assets. In testing for continuity of shareholder interest, respondent argues that the Goff Group's proprietary interest in Old Cannonsburg before the stock sale must be compared with the Goff Group's proprietary interest in New Cannonsburg after the liquidation. Of course, the Goff Group had no post-liquidation proprietary interest in New Cannonsburg, having been "cashed out" at the time of the stock sale. Consequently, respondent claims that the continuity of interest requirement has not been satisfied, and that New Cannonsburg is not entitled to F reorganization treatment. We agree with respondent. It is well established that the incidence of taxation depends not on the form but on the actual substance of *475 a transaction. Commissioner v. Court Holding Co.,324 U.S. 331 (1945); Helvering v. Clifford,309 U.S. 331 (1940). The step-transaction doctrine is a particular manifestation of the more general tax law principle that purely formal distinctions cannot obscure the substance of a transaction. Gregory v. Helvering,293 U.S. 465 (1935). If, upon consideration of the intentions of the parties and the nature of the steps or parts of a transaction or transactions, it appears that what was accomplished should properly be treated for tax purposes as one transaction, that treatment will be adopted in accordance with the step-transaction doctrine. Brown v. United States,782 F.2d 559 (6th Cir. 1986). There has been no showing by New Cannonsburg that the Old Cannonsburg stock was not acquired as the first step in a plan to acquire Old Cannonsburg's assets. On these facts, we cannot view the purchase and liquidation as separate and independent steps. Steps one and two were necessary for Brown-Schaefer to obtain ownership of Old Cannonsburg as a wholly owned subsidiary, although the merger could have been affected, and Russell frozen out as a minority shareholder of Old Cannonsburg, without *476 the acquisition of his stock. Brown-Schaefer's purchase of 98 percent of Old Cannonsburg's stock satisfied the 80-percent requirement contained in section 334(b)(2)(B) and thus guaranteed Brown-Schaefer a step-up in basis upon the liquidation of Old Cannonsburg. Having satisfied this prerequisite, the Brown Group merged Old Cannonsburg into Brown-Schaefer and took the desired step-up in basis. This was clearly their intent from the time negotiations for the purchase of Old Cannonsburg stock were commended. The Old Cannonsburg stock was purchased for approximately three times its book value. The Brown Group could not afford to ignore the tax advantage to be derived from a section 334(b)(2) liquidation. Thus, while the existence of initial intent to liquidate is not a requirement for a step-up in basis, its presence warrants integration of steps one and three. The facts also mandate integration of step two. In both the negotiations leading up to the Agreement, and at the time the Agreement was consummated, the Brown Group attempted to purchase Russell's interest in Old Cannonsburg. In its letter dated October 23, 1978, the Brown Group presented Russell with a "squeeze out" ultimatum; *477 Russell must either exchange his Old Cannonsburg stock for Brown-Schaefer stock or Brown-Schaefer will be "free to accomplish its purpose through other means." The record does not reveal what "other means" were available to Brown-Schaefer, but we presume that the Brown Group could have eliminated Russell's minority interest by operation of state law. The plan of merger was proposed and adopted on the same day Russell agreed to exchange his stock, and the merger was executed 1 week later. The formation of Brown-Schaefer, and the transfer to its of the Brown Group's rights under the Agreement, indicates an intent to merge the corporations in order to enjoy the benefits of a stepped-up basis. Brown-Schaefer's existence was necessitated by the mechanics of section 334(b)(2); New Cannonsburg could acquire a cost basis in Old Cannonsburg's assets through either an asset purchase or a stock purchase followed by a liquidation pursuant to section 334(b)(2). The merger technique is a recognized substitute for a simple corporate liquidation. Thus, the Brown Group's use of Brown-Schaefer as a means of obtaining a stepped-up basis in Old Cannonsburg's assets was sound. After the transaction *478 had been structured, the Agreement signed, and the liquidation accomplished, New Cannonsburg suffered operating losses. It is these losses which have caused New Cannonsburg to assert that the transaction constituted both a liquidation and a reorganization. We find this retroactive interpretation of a transaction which is straightforward on its face wholly unconvincing. As we have stated, when a transaction is composed of a series of related steps, each intended to achieve an overall objective, the various steps should be viewed in their entirety for the purpose of determining its tax consequences. Brown v. United States,supra.Thus, we conclude that Brown-Schaefer's acquisition of 100 percent of Old Cannonsburg's stock was inseparable from the subsequent merger of Old Cannonsburg into Brown-Schaefer. The integration of these transactions results in a 98-percent shift in ownership, which clearly violates the identity of shareholders and their proprietary interests as required for an F reorganization Section 381(b), therefore, precludes any loss carry back by New Cannonsburg. We must next determine Brown-Schaefer's basis in the 2 percent of Old Cannonsburg stock acquired from Russell *479 in exchange for 7 percent of Brown-Schaefer's stock. This, in turn, will determine the amount of depreciation and investment tax credit recapture suffered by Old Cannonsburg upon liquidation. There is no dispute as to Brown-Schaefer's basis in, and Old Cannonsburg's recapture resulting from, the 98 percent of Old Cannonsburg stock purchased from the Goff Group. New Cannonsburg contends that Russell's exchange of Old Cannonsburg stock for Brown-Schaefer stock constitutes a tax-free section 368(a)(1)(A) reorganization. Consequently, pursuant to sectionn 362, Brown-Schaefer would take a carry over basis equal to Russell's basis in the Old Cannonsburg stock. Upon Old Cannonsburg's liquidation into Brown-Schaefer pursuant to section 334(b)(2), Brown-Schaefer's aggregate basis in Old Cannonsburg stock would determine the amount of Old Cannonsburg's depreciation and investment tax credit recapture, as well as Brown-Schaefer's basis in the real and tangible personal property acquired from Old Cannonsburg. Respondent contends that Russell's exchange of Old Cannonsburg stock for Brown-Schaefer's stock constitutes a taxable transaction and not a tax-free reorganization. Thus, the amount of Old *480 Cannonsburg's depreciation and investment tax credit recapture would be determined by the aggregate of Brown-Schaefer's cost basis in the stock purchased from the Goff Group plus a cost basis in the 2 percent acquired from Russell. Respondent determined New Cannonsburg's basis in the Old Cannonsburg stock by multiplying the total number of outstanding Old Cannonsburg shares by the price paid per share to the Goff Group. [12]
New Cannonsburg then argues that respondent's computation "grosses up" Brown-Schaefer's basis in Old Cannonsburg's stock by giving Brown-Schaefer a fair market value rather than a carry over basis in Russell's 2-percent interest. This "gross up" results in increased depreciation and investment tax credit recapture for Old Cannonsburg. The parties disagree only as to a cost basis or carry over basis for Russell's 2-percent interest. We agree with respondent that a cost basis is correct. Pursuant to section 1001(c), a stock-for-stock exchange requires the recognition of gain unless otherwise provided. [13] *482 Petitioner's contention that section 368(a)(1)(A) *481 provides otherwise is incorrect. As discussed above, respondent correctly asserts that the requisite continuity of interest for reorganization is absent. In testing for continuity of shareholder interest, the courts have held that the requisite continuity is not fulfilled in the absence of a showing (1) that the transferor corporation or its shareholders retain a proprietary stake in the ongoing enterprise, and (2) that such retained interest represents a substantial part of the value of the property transferred. See generally LeTulle v. Scofield,308 U.S. 415 (1940); Pinellas Ice & Cold Storage Co. v. Commissioner,287 U.S. 462 (1933); Southwest National Gas Co. v. Commissioner,189 F.2d 332, 334 (5th Cir. 1951), affg. 14 T.C. 81 (1950); Kass v. Commissioner,60 T.C. 218 (1973), affd. without published opinion 491 F.2d 749 (3d Cir. 1974). Russell is the only historic shareholder retaining an equity interest in New Cannonsburg. The 2-percent continuity of proprietary interest does not qualify as a reorganization. Therefore, New Cannonsburg is entitled to a cost basis in the Old Cannonsburg stock under section 1012, and to an equivalent step-up in the basis of Old Cannonsburg assets under section 334(b)(2). Concomitantly, Old Cannonsburg is required to recognize ordinary income under the recapture provisions of sections 1245 and 1250 and to increase its income tax to reflect recaptured investment tax credit under section 47(b) based on a cost basis for Russell's 2-percent interest. We must next decide whether Russell's exchange of Old Cannonsburg stock for Brown-Schaefer stock constitutes a reorganization for purposes of section 354(a)(1). Thus, we are looking at the shareholder's end of the same stock-for-stock exchange discussed above. Russell contends that his exchange of Old Cannonsburg stock for Brown-Schaefer stock constitutes a reorganization, and is therefore tax free to him pursuant to section 354(a)(1). Respondent contends, however, that the stock-for-stock exchange does not qualify as a reorganization because it fails the continuity-of-interest test and that, consequently, Russell falls outside of section 354(a)(1) and must recognize *483 gain pursuant to section 1002. [14] For the same reasons discussed at length above, we again decide the issue for respondent. Section 354(a)(1) governs the recognition of gain or loss to exchanging shareholders in a reorganization. A transaction must constitute a reorganization, however, before taxpayers can resort to the nonrecognition rules of section 354. Turnbow v. Commissioner,368 U.S. 337 (1961). Brown-Schaefer's May 5, 1978, purchase of 98 percent of Old Cannonsburg's stock and Russell's October 24, 1978, exchange of Old Cannonsburg stock for Brown-Schaefer stock are two steps in the same transaction.The transaction fails the continuity-of-interest test and falls outside of the nonrecognition provisions of section 354(a)(1). Thus, we look to the historic shareholders, the Goff group, rather than to Brown-Schaefer's stockholdings to measure the continuity-of-interest. Therefore, Russell's claimed reorganization must fail. See Kass v. Commissioner,supra.
We must *484 next decide whether Russell's exchange of Old Cannonsburg stock for Brown-Schaefer stock qualifies as a contribution to capital pursuant to section 351. Russell contends that his exchange of Old Cannonsburg stock for Brown-Schaefer stock constitutes a mere change in the form of his investment and not a cashing in of his potential gain on the investment. He cites Portland Oil Co. v. Commissioner,109 F.2d 479 (1st Cir. 1940), affg. 38 B.T.A. 757 (1938), for the proposition that the capital contribution provisions were enacted to save the taxpayer from an immediate recognition of gain where the gain may have accrued in a constitutional sense, but where in a popular and economic sense there has been a mere change in the form of ownership. Respondent contends that petitioner fails to satisfy the requirements of section 351 and, consequently, is not entitled to nonrecognition treatment. Section 351 extends full nonrecognition of gain or loss to transfers of property by one or more persons to a corporation solely in exchange for such corporation's stock or securities, if the transferor (or transferors) are in control of the corporation immediately after the exchange. [15] "Control" is *485 defined by section 368(a)(1)(C) as being at least 80 percent of the combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of each nonvoting class of stock of the corporation. See section 1.351-1(a)(1), Income Tax Regs. Respondent asserts that Russell failed to satisfy the section 351 "control" requirement, and is thus precluded from nonrecognition treatment. We agree with respondent. Russell's exchange of 2 percent of Old Cannonsburg's stock for 7 percent of Brown-Schaefer's stock, when viewed in isolation, clearly fails the section 368 control requirement. The Court's reasoning in Portland Oil Co. v. Commissioner,supra, applies only to transactions which otherwise satisfy *486 the capital contribution provisions. Thus, Russell's inclusion in the control group is a prerequisite to nonrecognition. Russell contends, however, that by application of the step-transaction doctrine, his exchange of Old Cannonsburg stock for Brown-Schaefer stock should be integrated with the Brown Group's contributions of cash for Brown-Schaefer stock. Thus, cash and stock would have been contributed by the Brown Group and Russell in exchange for 100 percent of Brown-Schaefer's stock. That transaction would, on its face, appear to satisfy section 351. To be in control "immediately after the exchange" as required by section 351 "does not necessarily require simultaneous exchanges by two or more persons, but comprehends a situation where the rights of the parties have been previously defined and the execution of the agreement proceeds with an expedition consistent with orderly procedure." Section 1.351-1(a)(1), Income Tax Regs.
This argument fails, however, because it was not the intention of the Brown Group at the time the transaction was entered into the include Russell as a shareholder of Brown-Schaefer. At paragraph 2.2, the Agreement states as follows: In the event this Agreement *487 shall be assigned by the Purchaser as hereinafter provided to a corporation of which they shall own 100% of the outstanding capital stock (hereinafter referred to as Purchasing Corporation) that such Purchasing Corporation will make the representations and warranties as contained in Paragraph 3.0 below. [Emphasis added.] The Brown Group was the purchaser for purposes of the Agreement. Thus, Russell's exchange of Old Cannonsburg stock for Brown-Schaefer stock at the formation of Brown-Schaefer would have constituted a breach of paragraph 2.2 at the time the Agreement was assigned to Brown-Schaefer. Additionally, the Brown Group's attempts to purchase Russell's stock at the time the Agreement was signed, and again at the time the Agreement was consummated, demonstrates the lack of intent to include Russell in the cash for stock exchange at the formation of Brown-Schaefer. Though Brown-Schaefer's purchase of the Goff Group's stock and the subsequent merger of Old Cannonsburg into Brown-Schaefer were related events, Russell's exchange of Old Cannonsburg stock for Brown-Schaefer stock was not an intended part of the Brown-Schaefer incorporation transfer made by the Brown Group. American Bantam Car Co. v. Commissioner,11 T.C. 397, 405-407 (1948), *488 affd. per curiam 177 F.2d 513 (3d Cir. 1949), cert. denied 339 U.S. 920 (1950). As we stated in Kass v. Commissioner,60 T.C. 218, 226 (1973), affd. without published opinion 491 F.2d 749 (3d Cir. 1974): This result merely illustrates the truism that the step-transaction doctrine, even when worded consistently * * * and applied to identical facts, may result in integration in one case and "separateness" in another case simply because the legal question to be answered has changed. See King Enterprises, Inc. v. United States,418 F.2d 511, 516-519 (Ct. Cl. 1969). Russell has only himself to blame for this consequence. He insisted upon maintaining his status as a shareholder of Oil Cannonsburg until after the formation of Brown-Schaefer. It was then too late to become a participant in the section 351 transaction. We again decide the issue for respondent. Decisions will be entered for respondent.
Footnotes
1. These cases were consolidated pursuant to an Order of this Court dated February 27, 1986.↩
2. The parties agree that New Cannonsburg is liable, as transferee of assets with a fair market value of $4,400,000, for the deficiencies in Federal income taxes finally determined or adjudged to be due and payable by Old Cannonsburg for the taxable years ended May 31, 1977, May 31, 1978, and October 31, 1978. ↩
3. Fiscal year ended May 31. ↩
4. In the event the Court sustains respondent's position that the 1978 merger of Old Cannonsburg into Brown-Schaefer Corporation constitutes a complete liquidation of a subsidiary within the meaning of sections 332 and 334(b)(2), I.R.C. 1954↩, as amended, petitioner concedes the correctness of all adjustments set forth in the notice of liability, upon which this case is based. 5. Final return for short year ending October 31, 1978.↩
6. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
7. The Stipulation of Facts in Docket No. 5211-83 (Russell) incorporates by reference the Stipulation of Facts and attached exhibits in Docket No. 5210-83 (New Cannonsburg).
8. The number of shares issued to Russell was arrived at by computing the ratio between the market value of Russell's shares as established by the sale to Brown-Schaefer and the amount of thd down payment of $587,388.80, since the earnings of the corporation equating to all shares would be used to pay off the debt owed to the prior shareholders.↩
9. SEC. 381(b). Operating Rules.--Except in the case of an acquisition in connection with a reorganization described in subparagraph (F) of section 368(a)(1)-- * * * (3) The corporation acquiring property in a distribution or transfer described in subsection (a) shall not be entitled to carry back a net operating loss or a net capital loss for a taxable year ending after the date of distribution or transfer to a taxable year of the distributor or transferor corporation.↩
10. We note that Congress has amended sec. 368(a)(1)(F) to read as follows (applicable to transactions occurring after Aug. 31, 1982): "a mere change in identity, form, or place of organization of one corporation,↩ however effected." (Emphasis added.) Tax Equity and Fiscal Responsibility Act of 1982, sec. 225, Pub. L. 97-248, 96 Stat. 324, 490.
11. We note that this argument is fundamentally inconsistent with Brown-Schaefer's step-up in basis pursuant to sec. 334(b)(2), which is contingent upon a purchase followed by a liquidation. Congress' explicit intent in enacting sec. 334 was to codify the rule of Kimbell-Diamond Milling Co. v. Commissioner,14 T.C. 74 (1950), affd. per curiam 187 F.2d 718 (5th Cir. 1951), cert. denied 342 U.S. 827 (1951), that such an integrated transaction should be treated as the purchase of assets that in substance it is. See H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., A109 (1954); S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., 48 (1954); Cabax Mills v. Commissioner,59 T.C. 401, 408-409↩ (1972).
12. Brown-Schaefer paid the Goff Group $21.1583 per share for 116,300 shares of Old Cannonsburg stock ($2,460,710.26).↩
13. SEC. 1001(c).Recognition of Gain or Loss.--Except as otherwise provided in this subtitle, the entire amount of the gain or loss, determined under this section, on the sale or exchange of property shall be recognized.
14. SEC. 1002. RECOGNITION OF GAIN OR LOSS. Except as otherwise provided in this subtitle, on the sale or exchange of property the entire amount of the gain or loss, determined under section 1001, shall be recognized.↩
15. SEC. 351(a). General Rule.--No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property.↩