LAWRENCE R. PERRYMAN AND ALICE M. PERRYMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Perryman v. Commissioner
Docket No. 2676-86.
United States Tax Court
T.C. Memo 1988-378; 1988 Tax Ct. Memo LEXIS 409; 55 T.C.M. (CCH) 1588; T.C.M. (RIA) 88378; August 16, 1988. John Gigounas, for the petitioners. Katherine K. Vetter and Theodore Garelis, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION Fay, Judge: Respondent determined a deficiency in petitioners' Federal income tax for the 1981 taxable year in the amount of $ 894,267. [1] The issue for decision is whether, with respect to certain oil and gas drilling rigs transferred by petitioner to his wholly owned corporation, respondent properly allocated to petitioner the pre-sale income and expenses related to such rigs, and the gain realized on the subsequent sales of such rigs. FINDINGS OF FACT Some of the facts have been stipulated. The stipulated facts and the exhibits attached thereto are incorporated herein by reference. Petitioners, Lawrence R. Perryman ("Petitioner") and Alice M. Perryman, resided in Lodi, California, at *411 the time the petition in this case was filed. Alice M. Perryman is a party to this action only by reason of her having filed a joint Federal income tax return for taxable year 1981 with petitioner. During 1981, petitioner sold all of his interests in four separate oil and gas drilling rigs. This dispute involves the proper tax treatment to be given the sale of only two of such drilling rigs, hereinafter referred to as "rig 1" and "rig 2." Petitioner acquired rigs 1 and 2 when, in August, 1981, he bought out the interests of his only other partner, Henry Cavigli ("Cavigli"), in a partnership then owning the rigs, known as P&C Enterprises ("P&C"). Petitioner thereafter operated P&C as a sole proprietorship. Petitioner acquired his third drilling rig ("rig 3") indirectly, in October, 1980, when he bought all of the outstanding stock of a corporation known as Drilling Rigs, Inc. ("DRI") and became its sole shareholder. Petitioner constructed his fourth drilling rig ("rig 4") during 1981 and had not yet put it into service prior to its sale discussed below. Rigs 1 and 2, and rig 3 were leased by their respective owners to the Perryman Drilling Co., Inc. ("PDC"). Petitioner and *412 Cavigli owned PDC in equal shares from its inception until June, 1981, when petitioner and Cavigli caused PDC to redeem all of Cavigli's stock therein. Thereafter, PDC was wholly owned by petitioner, and was continued as a corporation. In connection with petitioner's acquisition of Cavigli's interest in P&C, and with PDC's redemption of Cavigli's shares therein, petitioner was counselled by both an attorney, Gary Damon ("Damon"), and an accountant, James F. Schnur ("Schnur"). Generally, PDC was in the business of contracting with third parties such as Chevron, Texaco, and Atlantic Richfield to do their drilling for them in the Sacramento Valley, California, with the rigs it leased from P&C and DRI. To provide protection from the risks inherent in operating the rigs leased to it, PDC was, pursuant to its lease agreements with P&C and DRI, required to: (1) provide property insurance for rig 1 and rig 2 and all appurtenant equipment; and, (2) provide liability insurance and to indemnify P&C and DRI from and against "all claims, demands, actions, proceedings, damages, liabilities, costs, and expenses, including attorney's fees, arising out of, connected with or resulting from the *413 lease of [rig 1] and [rig 2] and [their] appurtenant equipment." After petitioner's acquisition of Cavigli's interest in P&C, PDC had the same commitment with petitioner, as sole proprietor of P&C, with respect to providing such insurance protection for rigs 1 and 2. Since he first acquired an interest in rigs 1 and 2 in the 1960s, petitioner never purchased liability insurance in his individual capacity to protect himself, nor property insurance to protect against damage to the rigs; such insurance had always been carried by PDC to provide petitioner protection. Negotiations for Sales
On July 30, 1981, petitioner met, for the first time, S. Edward Tomaso ("Tomaso") to discuss a potential sale of rig 4. Tomaso's intent was to form an investor group which would own and lease oil and gas drilling rigs to PDC, similarly to the business conducted by DRI. At such meeting, petitioner and Tomaso discussed the possibility of Tomaso's acquiring rig 4 only. Following the July 30, 1981, meeting, petitioner and Damon had several telephone conversations with Tomaso concerning the sale of rig 4. On August 17, 1981, petitioner and Tomaso met in person for a second time to further *414 discuss the sale of rig 4. At this meeting, petitioner expressed his interest in selling to Tomaso not only rig 4, but also rigs 1, 2, and 3, on the condition that Tomaso lease all four rigs to PDC, petitioner's wholly owned corporation. The August 17, 1981, meeting lasted approximately two hours and, at its close, Tomaso expressed to petitioner an intent to buy rig 4, and stated that he might be interested in also acquiring rigs 1, 2, and 3. Between August 17 and September 2, 1981, Damon and Schnur had several telephone conversations, on petitioner's behalf, with both Tomaso and Tomaso's attorney, Charles McClung, negotiating the terms of the sale of rigs 1 through 4. On or before September 1, 1981, as a result of such negotiations, petitioner and Tomaso had reached agreement concerning the basics for the sale of all four rigs. In fact, prior to September 2, 1981, Tomaso and petitioner had already reached agreement as to the purchase price and the delivery date for the rigs. The only thing left undetermined as of September 1, 1981, was the amount Tomaso would charge PDC as rent for the use of rigs 1 through 4 after the sale. Petitioner and Tomaso, however, understood that such *415 rent would be substantially similar to what P&C and DRI had previously charged PDC for rig usage. On September 1, 1981, petitioner, as its sole shareholder, caused DRI to adopt a corporate resolution by which petitioner was to contribute rigs 1 and 2 to the corporation, and DRI was to assume approximately $ 2.5 million in bank debts secured by the rigs. Present at this meeting, inter alios, were: petitioner; Schnur; and Damon. The amount of debt to be assumed by DRI in accordance with the above-referenced resolution was that amount which, as advised and calculated by Damon and Schnur, would result in no gain recognition to petitioner pursuant to sections 351 [2] and 357. The loans to be assumed by DRI were held with First Interstate Bank. Petitioner never notified such bank of the purported September 1, 1981, change in rig ownership from petitioner to DRI, nor did petitioner effect an appropriate change of ownership on the Uniform Commercial Code ("UCC") financing statement filed with the California Secretary of State in connection with the First Interstate Bank loan. Such bank was notified of the change in ownership until December 21, 1981, when Tomaso submitted thereto an *416 addendum to a request for term-loan financing. That document, in describing the use to which the loan proceeds would be put, states that the change in ownership of rigs 1 and 2, from petitioner to DRI, occurred on December 2, 1981. On September 2, 1981, a meeting was held between petitioner, Damon, Schnur, and Tomaso. At this meeting, an agreement styled as a "Letter Agreement" was executed which provided. LETTER AGREEMENT To: LAWRENCE R. PERRYMAN, PERRYMAN DRILLING COMPANY, INC. and DRILLING RIGS, INC. This Letter Agreement is executed this 2nd day of September, 1981, and summarizes the verbal agreements between the above and S. EDWARD TOMASO, as a representative of a limited partnership and a corporation to be formed after the execution of this agreement. The limited partnership and the new corporation agree to enter into formal agreements with respect to the following: 1. Purchase Drilling Rig #4 from Lawrence R. Perryman for a total price *417 of $ 2,750,000, payable in cash upon completion of construction of the rig, but in any event, not later than October 31, 1981. 2. Perryman Drilling Company, Inc. agrees to enter into a standard drilling rig lease with the buyers for Drilling Rig #4 at a rate of $ 3,000 per day for each day said rig is working. This lease will be effective on the date of transfer and shall expire on December 31, 1981. 3. Purchase Drilling Rigs #1, 2, and 3 from Drilling Rigs, Inc. for a total price of $ 5,850,000 payable as follows: A cash down payment of $ 50,000 on December 15, 1981, cash in the amount of $ 5,300,000 on January 4, 1982 which shall bear interest at the rate of seventeen and one-half percent (17 1/2%) per annum from December 15, 1981 and a final payment of $ 500,000 on January 4, 1983 which shall bear interest at the rate of twenty-one percent (21%) per annum from December 15, 1981. The transfer of these rigs shall be completed on December 15, 1981. 4. Perryman Drilling Company, Inc. agrees to enter into a standard drilling rig lease with the buyers for DRIllig Rigs #1, 2, and 3 at a total combined rate of $ 2,540 per day whether or not the rigs are actually working. This *418 lease will be effective on the date of transfer and shall continue on a day-to-day basis until December 31, 1981, when it shall expire. 5. Purchase all yard equipment and supplies owned by Perryman Drilling Company, Inc. for a total purchase price of $ 400,000, payable in cash on December 15, 1981. 6. Lawrence R. Perryman agrees to act as a director of the new corporation to be formed for a period of one (1) year from December 15, 1981. 7. The buyers agree to accept all equipment and supplies being purchased hereunder in an "as is" condition. 8. The buyers shall be responsible for any Sales or Use Tax as a result of this purchase. 9. This Agreement is conditioned upon the buyers obtaining a loan in the amount of $ 6,450,000. Unless buyers have a written commitment by Oct. 31, 1981 from a reputable lending institution that it will lend this amount, this entire agreement shall be null and void. 10. This Agreement shall bind and inure to the benefit of the respective heirs, personal representatives, successors, and assigns of the parties hereto. 11. This Agreement shall be governed by and construed according to the laws of the State of California. IN WITNESS *419 THEREOF, the parties have signed this Agreement effective the day and year first above written. /s/ LAWRENCE R. PERRYMAN PERRYMAN DRILLING COMPANY, INC.
BY: /s/ Lawrence R. Perryman
DRILLING RIGS, INC.
BY: /s/ Lawrence R. Perryman
/s/ S. EDWARD TOMASO
In late August, 1981, to assist him in obtaining the financing necessary to consummate the purchase of all four rigs, Tomaso obtained the services of Gardner W. Spring, Jr. ("Spring"). Prior to becoming an independent banking consultant in 1976, Spring had worked for fourteen years for United California Bank, subsequently called First Interstate Bank (hereinafter referred to as "First Interstate"), as vice president and manager of general banking of the Natural Resources Division. In the course of his profession, both with the bank and as an independent consultant, Spring had assisted petitioner in obtaining financing for a number of petitioner's ventures, and knew petitioner to be very reputable in the oil industry, an industry in which contracts are often done on the basis of handshakes. On October 28, 1981, petitioner had DRI adopt a plan of complete liquidation pursuant to which all corporate assets would *420 be sold to Tomaso in accordance with a "contract of sale", and all proceeds from said sale would be distributed to petitioner, the sole shareholder, within 12 months after the adoption of the plan of liquidation. The "contract of sale" referred to by the resolution adopting the plan of liquidation was the above-quoted Letter Agreement signed on September 2, 1981. On November 12, 1981, Spring submitted to First Interstate a request for term loan financing on Tomaso's behalf for the purchase of rigs 1 through 4. This request -- the only such request submitted to any bank -- states: "Perryman will convey all of his personal drilling rig interests in Drilling Rigs, Inc.", i.e., at some point after November 12, 1981. (Emphasis added.) An addendum to the request for term loan financing, such addendum being dated December 21, 1981, states that petitioner transferred his personal ownership of rigs 1 and 2 to DRI "effective December 2, 1981." On December 10, 1981, a final "Agreement to Purchase and Sale of Equipment" was entered by DRI and Tomaso. Therein, the parties designated a closing date for the sale of December 28, 1981. This agreement provided for the sale by DRI of *421 rigs 1, 2, and 3 and spare yard equipment for a total purchase price of $ 6,000,000. A separate agreement for the purchase and sale of rig 4 for $ 3 million was entered into on December 10, 1981, by petitioner and Tomaso. The tax treatment given the sale of rig 3, which had always been held by DRI, and rig 4, which petitioner sold personally, is not in dispute. On February 24, 1982, pursuant to a corporate resolution, petitioner had DRI comply with the plan of liquidation previously adopted. After retaining sufficient assets to meet the claims of its creditors, DRI distributed to petitioner $ 2,899,741 in complete liquidation of itself. Tax Treatment of Rigs Transferred to DRI
Petitioner employed one full-time employee, Joan Forsythe ("Forsythe"), as a bookkeeper to effect all recordkeeping necessitated by DRI, PDC, and P&C. Specifically, Forsythe did the billing by P&C and DRI to PDC for its rig usage. Despite the purported September 1, 1981, transfer of rigs 1 and 2 by petitioner to DRI, Forsythe caused petitioner's sole proprietorship, P&C, to bill PDC for usage of the rigs through December 1, 981. DRI billed PDC for usage of rigs 1 and 2 from December 2, 1981, until *422 the date of the sale to Tomaso. PDC made payment, as effected by Forsythe, to P&C for rig usage through December 1, 1981, in accordance with the bills Forsythe had prepared. Such payment was received by P&C on January 14, 1982, and, as dictated by his use of a cash basis for accounting, was reported by petitioner on Schedule C of his 1982 Federal income tax return. Such return was prepared by Schnur in the spring of 1983. Similarly, DRI reported on the tax return filed for its fiscal year ending February 28, 1982, only that amount billed by Forsythe on its behalf, i.e., for the period between December 2, 1981, and the closing date of the sale to Tomaso. DRI's return was prepared by Schnur during 1982. Schnur also prepared the returns of PDC for 1981 and 1982. Also on petitioner's and DRI's tax returns, deductions were taken, with respect to different periods, in connection with interest payments respectively made on the loans purportedly assumed by DRI upon petitioner's contribution of rigs 1 and 2. The deductions taken by petitioner for the payment of interest include payments made between September 1, 1981, the date the rigs were purportedly transferred to DRI, and *423 December 1, 1981. DRI claimed deductions for interest paid on the loans assumed from petitioner for the period beginning with December 2, 1981. Depreciation on rigs 1 and 2 was also deducted, for different periods, by petitioner and DRI on their respective tax returns. Petitioner, through his sole proprietorship, P&C, deducted depreciation on those rigs for the tax period through November 30, 1981. DRI deducted the depreciation for the periods thereafter. In preparing petitioner's and DRI's tax returns for 1981 and 1982, Schnur was not advised by petitioner concerning what to use as the date on which the rigs were contributed to DRI. Even though Schnur was present at the September 1, 1981, board meeting of DRI, he used instead December 2, 1981, as the date of contribution for purposes of allocating the rigs' tax attributes for the 1981 tax year between petitioner and DRI. Tax Treatment Given Sale and Liquidation
Subsequent to the closing for the sale to Tomaso on December 28, 1981, DRI reported the sale of three gas drilling rigs, rigs 1, 2, and 3, reflecting a gain realized of $ 2,466,567. Of this realized gain, DRI recognized $ 644,164 attributable to section *424 1245 recapture income; the remainder of the gain realized was reported as tax-free pursuant to section 337. [3] The section 1245 recapture gain was then partially offset by net operating losses carried-over by DRI from its taxable year ending February 28, 1981. Petitioner reported no gain on his individual tax return for 1981 with respect to the contribution of rigs 1 and 2 to DRI, pursuant to section 351, or with respect to the sale of rigs 1 and 2, pursuant to a belief that DRI, and not petitioner, sold the rigs. In 1982, petitioner reported only capital gains with respect to the distribution received in complete liquidation of DRI. Notice of Deficiency
On October 28, 1985, respondent sent petitioner a notice of deficiency which effectively *425 ignored the transfer of rigs 1 and 2 to DRI, and attributed to petitioner the pre-sale income and expenses related to such rigs and the gain realized on the sale of those rigs. Accordingly, in such notice, respondent determined that petitioner's taxable income for 1981 should be increased by reason of: (1) Section 1245 recapture income from the sale of rigs 1 and 2 to Tomaso; (2) Capital gain income received from the sale of rigs 1 and 2 to Tomaso; and, (3) Rental income on rigs 1 and 2 for the period December 2, 1981 through December 28, 1981. In addition, respondent in his notice disallowed a portion of the depreciation expense taken on rigs 1 and 2, and disallowed a portion of the interest expense taken with respect to loans secured by rigs 1 and 2. The reasons for such disallowances by respondent are not in the record but are immaterial to this opinion because they do not relate to the issue before us. The same notice of deficiency also decreased petitioner's taxable income for 1982 because, pursuant to respondent's position that petitioner, and not DRI, sold the rigs to Tomaso, the liquidating distribution received by petitioner from DRI was reduced substantially. The notice *426 of deficiency sent to petitioner does not indicate that respondent is relying upon any particular theory with respect to the attribution of 1245 recapture and capital gain income from the sale of rigs 1 and 2 to petitioner. The notice never mentions, in particular, reliance upon section 482. With respect to the adjustments made in connection with the sale of rigs 1 and 2, the notice merely states: (a) it is determined that for the taxable year 1981 you had section 1245 recapture income of $ 702,869.00 on the sale of rigs, as follows: Rig #1
(50%)
$  26,105.00
Rig #2 [4]
(50%)
66,950.00
Rig #2
(67%)
$ 609,814.00
$ 702,869.00
Accordingly, your taxable income for 1981 is increased by $ 702,869.00. * * * (e) it is determined that your capital gain income for taxable year 1981 is $ 404,976.00 instead of ($ 3,000.00) reported on your return. Accordingly, your taxable income for 1981 is increased by $ 407,976.00. See Exhibit A for computation.
The "Exhibit A" to which the notice of deficiency refers *427 is a schedule D to Form 1040 which reflects a computation of petitioner's income from capital gains under which the sale of rigs 1 and 2 to Tomaso is treated as if it were made by petitioner. On the same day that the notice of deficiency was sent to petitioner, respondent sent a revenue agent's report ("report") to DRI's representative, Schnur, concerning DRI's taxable year ending February 28, 1982. With respect to rigs 1 and 2, such report proposed a decrease in the amounts reported by DRI as rental income, interest expense, and 1245 recapture income on the sale. The report reallocated these items to petitioner consistent with the treatment given him in the notice of deficiency, i.e., as if the sale had been made by petitioner. The report specifically discusses two theories under which such reallocation would be proper: section 482; and a substance-over-form view of the transaction. ULTIMATE FINDINGS OF FACT 1. Petitioner transferred rig 1 and rig 2 to DRI on December 2, 1981. 2. Prior to the transfer of rig 1 and rig 2 to DRI, petitioner had reached an agreement with Tomaso to sell him all four rigs. 3. Petitioner, and not DRI, sold rig 1 and rig 2 to Tomaso. *428 OPINION The issue for decision is whether, with respect to certain oil and gas drilling rigs transferred by petitioner to his wholly owned corporation, respondent properly allocated to petitioner the pre-sale income and expenses related to such rigs, and the gain realized on the subsequent sale of such rigs. Burden of Proof
As a preliminary matter, it is necessary to decide which party bears the burden of proof with respect to the applicability of section 482. [5] Generally, the burden of proof is on the taxpayer. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a).[6] Petitioner contends, however, that respondent's reliance upon section 482 is a "new matter", as contemplated by Rule 142, because section 482 was never mentioned in the notice of deficiency, and because nowhere in the notice does it state that respondent's determination involves an "allocation among businesses" as contemplated by section 482. Respondent contends that the burden of proof is on petitioner with respect to the applicability of section 482 because it was clearly evident in the notice of deficiency that section 482 was being relied upon as shown by the way the section 1245 recapture *429 and capital gain income from the sale of rigs 1 and 2 was being allocated to petitioner and way from DRI, contrary to how it had been reported. Respondent further contends that the notice of deficiency, taken together with the revenue agent's report sent to DRI which specifically addressed the section 482 issue, adequately notified petitioner of respondent's reliance on section 482 as part of his determination in the notice of deficiency. *430 Regarding upon whom the burden of proof tests, petitioner asserts that the controlling rule of law is that which we expressed in Achiro v. Commissioner,77 T.C. 881 (1981). In Achiro, at 891, we stated: if respondent does not indicate in the notice of deficiency that he is relying on section 482, but alerts the taxpayer of his reliance on section 482 formally in pleadings far enough in advance of trial so as not to prejudice the taxpayer or take him by surprise at trial, then the burden of proof shifts to respondent to establish all the elements necessary to support his allocation under section 482. [Citations omitted.]
Despite our holding in Achiro, however, we will follow the precedent established in the court to which an appeal would lie. See Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1974). Appeal in this case would lie in the Ninth Circuit. In Abatti v. Commissioner,644 F.2d 1385 (9th Cir. 1981), the taxpayer sought to have the burden of proof placed on the respondent based upon the same arguments petitioner here advances. In Abatti, three entities in which *431 the taxpayer was a partner (or a subchapter S corporation shareholder) were sent a revenue agent's report which proposed adjustments to each entity's taxable income on the grounds that, under section 482, the intercompany transactions did not clearly reflect such income. On the same day, respondent in Abatti sent statutory notices of deficiency to the taxpayer which stated merely: It is determined from the books and records of the partnership (or subchapter S corporation) that you have income of * * * dollars for the taxable year * * * in lieu of * * * dollars reported on your return.
With respect to the taxpayer's argument to place the burden of proof on the Commissioner, the Ninth Circuit held: if a deficiency notice is broadly worded and the Commissioner later advances a theory not inconsistent with that language, the theory does not constitute new matter, and the burden of proof remains with the taxpayer. [Citations omitted.]
Abatti v. Commissioner, supra at 1388. The language in the deficiency notice issued to petitioner is not substantially different from the language of the notice issued in Abatti. Further, as was of import in *432 Abatti, petitioner was notified of respondent's reliance on section 482 by the revenue agent's report sent his wholly-owned corporation on the same day the notice of deficiency was sent. Thus, the facts being substantially similar to Abattti, we reach the same conclusion. Accordingly, we hold that the burden of proof on all matters, including the applicability of section 482, is upon petitioner. Treatment of the Sale
Petitioner asserts that he contributed rigs 1 and 2 to DRI on September 1, 1981, prior to petitioner having reached any binding agreement with Tomaso concerning the sale of such rigs. Thus, petitioner contends, any gain resulting from the ultimate disposition of the rigs is properly taxable to DRI, as it was the seller of the rigs. Respondent has advanced two theories supporting his attribution of the gain from the sale of rigs 1 and 2 to petitioner: section 482; and a substance-over-form theory as that which was applied in Commissioner v. Court Holding Co.,324 U.S. 331 (1945). Respondent argues that, under either theory and regardless of whether rigs 1 and 2 are found to have been contributed on September 1 or December 2, 1981, the *433 income from the rigs' ultimate disposition is properly taxable to petitioner, as he was, in substance, the seller of the rigs. Contrary to petitioner's assertion of a September 1, 1981, contribution date, we find that the contribution of rigs 1 and 2 by petitioner to DRI occurred on December 2, 1981. Petitioner's only evidence that the contribution occurred on September 1, 1981, consists of petitioner's self-serving testimony, the testimony of Damon and Schnur, and DRI's corporate minutes bearing such date in which it was resolved that the contribution would be made. With respect to the testimony offered, we find that the witnesses' actions speak louder than their words. With respect to DRI's corporate minutes, while such minutes may, in the absence of other contradictory evidence, be sufficient to support petitioner's asserted date of contribution, there exists in the record overwhelming evidence that December 2, 1981, was the date of contribution. Petitioner, his bookkeeper, and his accountant all failed to recognize that DRI "owned" the rigs subsequent to September 1, 1981, when: (1) Invoicing for rig usage: (2) Paying interest on loans secured by the rigs; (3) Notifying creditors *434 of the change of ownership for UCC purposes; (4) Accounting for depreciation expenses with respect to the rigs; and, (5) Reporting these various items in tax returns filed by petitioner and DRI with respondent. With respect to petitioner's notification of his creditors about the change in rig ownership, United California Bank, a holder of a security interest in rigs 1 and 2, was not notified of any existing or imminent ownership change until Spring submitted to such bank Tomaso's request for term loan financing and the addendum thereto. The first of such documents, the original request for term loan financing, stated that the change in ownership was to occur at some point in time after November 12, 1981. The second such document, the addendum to the original request, states that the ownership change occurred on December 2, 1981. Moreover, with respect to petitioner's use of December 2, 1981, date of contribution for tax reporting purposes, payments for rig usage from PDC to petitioner were not effected until January, 1982, and petitioner's tax return with respect to such year was not prepared until the spring of 1983. In petitioner's return for 1982, petitioner and Schnur *435 reported, as being petitioner's income, payments from PDC for rig usage between September 1, 1981 and December 2, 1981. Thus, petitioner and Schnur continued to use December 2, 981, as the date for contribution at a time more than one year beyond the date such rigs were sold. Petitioner's contribution of rigs 1 and 2 to DRI on December 2, 1981, was made pursuant to section 351. [7] That section generally provides for the nonrecognition of gain or loss by a taxpayer on transfers of property made to a controlled corporation "where in a popular and economic sense there has been a mere change in the form of ownership and the taxpayer has not really 'cashed in' on the theoretical gain, or closed out on a losing venture." Portland Oil Co. v. Commissioner,109 F.2d 479, 488 (1st Cir. 1940), cert. denied 310 U.S. 650 (1940). See S. Rept. 275, 67th Cong., 1st Sess. 11 (1921). *436 Section 482, on the other hand, provides the Commissioner with the authority to distribute or allocate income or expenses between "two or more organizations, trades, or businesses * * * owned or controlled * * * by the same interests, * * * if he determines that such distribution * * * or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses." The predecessor of section 482, which was substantially similar to the current section 482, was adopted by Congress to prevent the avoidance of taxes through such means as "shifting of profits, the making of fictitious sales and other methods frequently adopted for the purpose of 'milking'." H.R. Rept. 2, 70th Cong., 1st Sess. 16 (1927); S. Rept. 960, 70th Cong., 1st Sess. 24 (1928). Significantly, section 482 may be applied even where Congress otherwise specifically provided for the nonrecognition of gain or loss (such as section 351), if it is necessary to prevent the avoidance of taxes or to clearly reflect income. Sec. 1.482-1(d)(5), Income Tax Regs. See generally Foster v. Commissioner,80 T.C. 34, 144-159 (1983), affd. in part *437 and vacated in part on another issue 756 F.2d 1430 (9th Cir. 1985). Respondent's substance-over-form theory is founded upon Commissioner v. Court Holding Co.,324 U.S. 331 (1945) and its progeny. In Court Holding Co., the Supreme Court stated that: The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of sale, is relevant. A sale by one person cannot be transferred for tax purposes into a sale by another by using the latter as a conduit through which to pass title.
Commissioner v. Court Holding Co., supra at 334. The analysis to be applied under either theory relied upon by respondent is substantially the same. This analysis has been expressed as follows: Under section 482, the relevant inquiry is whether the proceeds from the sale of the transferred property must be allocated to the transferor "in order to prevent evasion *438 of taxes or clearly to reflect * * * income." To rebut such a determination by the Commissioner, the taxpayer must establish that not attributing the gain to the taxpayer more clearly reflects the proper allocation of income. To do so, he would be required to establish that he did not "cash in" on the gain -- in effect, that the transaction was of the kind intended to receive nonrecognition treatment under section 351. Similarly, under what is described as the substance-over-form doctrine, the controlling inquiry is whether the corporate recipient was merely a conduit for the sale of assets by the transferor; if so, the transferor "cashed in" on the gain, and nonrecognition treatment is inappropriate under section 351.
Stewart v. Commissioner,714 F.2d 977, 989 (9th Cir. 1983), affg. T.C. Memo. 1982-209; (emphasis in original). Initially, petitioner argues that section 482 is inapplicable because, petitioner contends, respondent is not making an allocation as between "two or more organizations, trades, or businesses," as is required by that section, but rather is making an allocation as between a business, DRI, and an individual, petitioner. *439 That is, petitioner argues that he falls into the one situation where, although the substance-over-form doctrine may be applied, section 482 may not, i.e., where both taxpayers involved are not each an organization, trade or business. As support for his position, petitioner cites Fogelsong v. Commissioner,691 F.2d 848 (7th Cir. 1982), revg. 77 T.C. 1102 (1981). The facts of this case, however, are easily distinguished from those of Fogelsong. In Fogelsong, the Court found that the taxpayer had never performed services in a capacity other than as an employee of his wholly owned personal service corporation, and that the taxpayer's use of such corporation as a means of conducting business did not result in the prohibited shifting of profits. On the other hand, in the case now before us, petitioner has, since August, 1981, owned and leased rigs 1 and 2 actively through his sole proprietorship, P&C. Furthermore, petitioner has acknowledged his role as a sole proprietor of P&C when he filed his tax return for the year at issue. Accordingly, we hold that respondent's allocation is clearly being made between the requisite two organizations, trades *440 or businesses, and that, if all other requirements of the two rules are met, section 482 and the substance-over-form doctrine are equally applicable. Petitioner next contends that the sale of rigs 1 and 2 was properly reported by DRI because said corporation was, in both form and substance, the seller of the rigs. Such contention must be supported by the facts surrounding the entire sales transaction. Commissioner v. Court Holding Co., supra. While we recognize the difficulty facing someone such as petitioner -- who may be acting in one of several capacities at any given time, i.e., individually or as a representative of his wholly owned corporation -- we find that the record reflects that the sale to Tomaso was, in substance, one made by petitioner. Petitioner began negotiating with Tomaso for the sale of rigs 1 and 2 following their meeting on August 17, 1981. By September 1, 1981, petitioner and Tomaso had "already hammered out the purchase price and the delivery date" with respect to such sale. Moreover, on September 2, 1981, petitioner and Tomaso entered in the Letter Agreement which was a summary of "the verbal agreements between [petitioner, PDC and *441 DRI] and S. EDWARD TOMASO." In an industry in which "contracts are done on the basis of a handshake," as Spring testified, the above-described acts show that an agreement had been reached by petitioner and Tomaso prior to the date the rigs were contributed to DRI, i.e., December 2, 1981. This is especially true when one considers that "nobody would ever question a Lawrence Perryman handshake", and petitioner had done far more towards agreeing to the sale than merely giving Tomaso a handshake. Petitioner contends that the Letter Agreement was not the final agreement for the sale of the rigs -- that a final contract was not executed until December 10, 1981, when the "Agreement to Purchase and Sale of Equipment" was signed. Our reading of both the Letter Agreement an the final agreement, however, indicates that the two documents are not materially different. The December 10, 1981, document does contain more precise language and is more exact in its definition of what is being bought and sold, but the Letter Agreement clearly reflects that petitioner and Tomaso had a meeting of the minds as to the sale prior to December 2, 1981. Moreover, when petitioner, as chairperson of DRI's *442 board of directors, caused DRI to adopt its plan of liquidation on October 28, 1981, petitioner referred to th September 2, 1981, Letter Agreement as being the "contract of sale" pursuant to which the sale to Tomaso would be effected. This further shows that the Letter Agreement contained petitioner's and Tomaso's basic agreement concerning the sale. Petitioner contends that an agreement for the sale was not reached with Tomaso prior to December 10, 1981, because the September 2, 1981, Letter Agreement was merely a conditional contract contingent upon Tomaso obtaining, by October 31, 1981, a written commitment from a reputable institution to provide the requisite financing. Such an argument is specious. On October 28, 1981, even though Tomaso had not yet submitted any requests for financing to any lending institutions, petitioner caused DRI to adopt a plan of liquidation pursuant to which rigs 1, 2, and 3 would be sold to Tomaso in accordance with the terms of the Letter Agreement. Thus, petitioner himself did not give credence to the alleged provisional nature of the Letter Agreement. Petitioner contends that DRI was not a mere conduit through which rigs 1 and 2 passed. *443 To support this position, petitioner argues that there were two valid business purposes for his transfer of rigs 1 and 2 to DRI: (1) To consolidate his gas drilling rig leasing operations; and, (2) To place the rigs within a corporate shell to provide him protection from the risks inherent in their operation. Although we find that petitioner intended to consolidate rigs 1 and 2 into DRI, we find that the impetus behind such consolidation was not a bona fide business purpose on the part of petitioner. Rather, it is clear from the record that petitioner's motivation for the contribution to DRI emanated from his concerns over the tax consequences of the sale of rigs 1 and 2 to Tomaso. Petitioner had reached an agreement with Tomaso for the sale of all four rigs by September 2, 1981. Petitioner then adopted a plan of liquidation for DRI on October 28, 1981. Thus, when petitioner contributed rigs 1 and 2 to DRI on December 2, 1981, petitioner had already taken affirmative steps towards liquidating the corporation into which he allegedly intended to consolidate such rigs. Therefore, although petitioner may have had a desire to consolidate, such consolidation was not for business *444 purposes. The consolidation was rather for purposes of the sale to Tomaso, and was the precise type of consolidation intended to be avoided by both section 482 and the substance-over-form doctrine. With respect to petitioner's contention that he was limiting his liability exposure by the transfer of the rigs to DRI, such is not supported by the record. In view of the full insurance coverage already provided by PDC, petitioner has not established that the transfer of the rigs to DRI provided him any additional protection. This is especially true in light of petitioner's full control of PDC, which enabled him to ensure that sufficient insurance coverage was being provided thereby, and in light of petitioner's historical use of PDC as the only procurator of insurance to cover him, in case of liability, and to cover his rigs, in case of damage. To find a legitimate desire for additional protection from exposure, we must be able to discern a legitimate business need therefor. Under the facts of this case, we find no such need. Without valid business purposes for the transfer of rigs 1 and 2 to DRI, DRI becomes a mere conduit through which the rigs passed prior to their ultimate *445 sale. Petitioner's use of DRI as a conduit by which to reduce his tax liability is even more apparent when one considers petitioner's awareness of the tax consequences of a sale made by him directly. Petitioner was being advised by an attorney and an accountant from the very outset. Damon and Schnur were both intimately involved with petitioner's acquisition of Cavigli's interest in P&C, with petitioner's negotiations with Tomaso concerning the sale of all four rigs, and with petitioner's contribution of rigs 1 and 2 to DRI. Moreover, Damon and Schnur had both been cognizant enough to structure the contribution of rigs to, and the assumption of debt by, DRI so that petitioner would not have to pay any tax in relation to the contribution of the rigs. For the reasons stated above, we find that petitioner has failed to show that not attributing the gain on the sale of rigs 1 and 2 would clearly reflect the proper allocation of income. Likewise, petitioner has failed to show that DRI was not a mere conduit for the sale of rigs 1 and 2 such that petitioner was effectively able to shift income and "cash in" on the rigs' appreciation in a way contrary to Congress' intention in passing *446 section 351. Accordingly, we hold that the technical corporate form of ownership of the rigs at the time of sale will be ignored, and that the income from the sale of rig 1 and rig 2 is attributable to petitioner pursuant to either section 482, or the substance-over-form doctrine. We further hold that the rental income, and depreciation and interest expenses with respect to rig 1 and rig 2 through December 28, 1981 are likewise attributable to petitioner pursuant to section 482. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Consistent with his view of the transaction involved in this case, respondent also determined an overpayment in petitioner's Federal income tax for the 1982 taxable year in the amount of $ 126,822. That year, however, is not before us. ↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the year at issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
3. Section 337, as in effect in 1981, provided: GENERAL RULE. -- If, within the 12-month period beginning on the date on which a corporation adopts a plan of complete liquidation, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims, then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period. ↩
4. This adjustment was actually with respect to rig 1, to reflect petitioner's acquisition of Cavigli's interest in the rig during 1981. ↩
5. Section 482 provides: In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distributions, apportionment, or allocations is necessary in order to prevent evasion of taxes or clearly to reflect the income of any such organizations, trades, or businesses. * * * ↩
6. Rule 142(a) provides in relevant part: The burden of proof shall be upon the petitioner * * * except that, in respect of any new matter, increases in deficiency, and affirmative defenses, pleaded in his answer, it shall be upon the respondent.↩ * * * [Emphasis added.] 7. Section 351(a) provides: No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. Section 368(c) provides:
Section 368(c) provides: * * * the term "control" means the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes off stock of the corporation. ↩